GOVER, *et al.* vs. HALL, Ex'r. of GARRETT, &c.

1810.
JUNE.

Gover
vs
Hall

APPEAL from a decree of the Court of Chancery. By the record it appears, that a bill was filed on the 15th of June 1772, by *Amos Garrett*, in his own right, and as administrator, with the will annexed, of *Peter Dicks*, against *Jacob Giles*. The objects of the bill being stated in the decrees of the chancellor, and in the opinion delivered by this court, they are here omitted. A *subpena* and injunction issued, as prayed for by the bill. At May term 1774, the defendant put in his answer, to which at May term 1782, the complainant excepted, and in 1784 the chancellor ruled the exceptions good, and ordered the defendant to make a more full and perfect answer. The death of *Giles* was afterwards suggested, and a bill of revivor filed against his executors, devisees and representatives. The executors answered, and in 1785 a commission issued by consent to certain persons to audit the accounts between the parties. In 1789 the death of *Garrett* was suggested, and a bill of revivor filed by *Benedict Edward Hall*, as executor of *Garrett*, and as administrator *de bonis non* of *Dicks*. against the executors, devisees and representatives, of *Giles*. In 1790 the auditors made their report. Commissions issued, and testimony was taken and returned. In February 1796 an amended bill of revivor was filed by the complainant. stating that the original bill was filed on the 2d of December 1771, against *Jacob Giles*, and against *Nathaniel Giles*, in his own right and as administrator of *John Giles*, which, on the death of *Jacob*, was revived against his executors, &c. who have become parties. That *Nathaniel* never answered, and is now dead, and his executors are also dead, and no administration on his estate, but that he left four daughters his representatives. That

On a bill in chancery filed in 1772 by one partner, in his own right, and as administrator of another partner, against a third partner, to be relieved on the ground of fraud and imposition against a bond passed by the complainant, on a settlement of the partnership accounts, to the defendant, in 1755; to have an account of the profits of certain works carried on in partnership from 1751 to 1765; and, as representative of the other partner, to have an account of the share of profits, from which that partner was arbitrarily excluded, during the same period Held, that from the facts in the case the settlement in 1755 must be taken to be fair, and if liable to any exceptions, it can only be on the ground of error or mistake; and the complainant can now only be permitted to surcharge and falsify, and that no further than the specifications in his bill. The *onus probandi* is on him, and after a voluntary settlement by the parties themselves of long and intricate transactions, which cannot now be fully known or unravelled; the

lapse of nearly 16 years from the time of the settlement, to the filing of the bill; the frequent payment of money upon the bond passed on the settlement, and the death of the only material witness—the surcharge or falsification must be clearly demonstrated and proved before it can be allowed—and from a strict examination of all the proofs, it does not appear that there were any errors or mistakes in the settlement, or that the complainant was in any manner injured. That with respect to the other partner, (for whom profits are claimed by the complainant as his administrator,) it appears that he was left out of the new partnership of 1753, when an account was opened against him, in which he was charged with his proportion of the money advanced by the other partners in the former partnership; that he made considerable payments in money on that account, and in 1754 gave his note for the balance, which was paid to the order of the complainant, and his account closed. He died in 1760, and never claimed any interest in the partnership after 1753, and there is no evidence that he considered himself, or was considered by others as a partner. After which acquiescence and lapse of time, a court of equity will presume that his interest was relinquished.

Where the court of appeals reversed a decree of the court of chancery, and directed that the defendants account with the complainant, and that the chancellor have the account stated by the auditor &c. which having been done, and a decree passed for payment of the sum stated to be due from the defendants to the complainant—an appeal lies from such decree to the court of appeals.

An act of assembly directing the court of appeals to hear and determine the matter of a former degree of that court

An appeal lies from an interlocutory decree of the court of chancery.

1810.

Gover
vs
Hall

*John Giles* was son of *Jacob Giles,* and died in the life-time of his father, intestate, and without issue, and since the death of *Nathaniel* there has been no administration on his estate. That certain of the devisees and representa-tives of *Jacob* are since dead, none of them having ever answered the bill of revivor against them, although com-missions had issued by consent, and testimony had been taken. He prayed that the suit might stand and be re-vived against the executors, devisees and representatives, of *Jacob,* the representatives of *Nathaniel,* and the repre-sentatives of the deceased representatives, &c. On the coming in of the answers of all the devisees and represen-tatives, it was agreed that all the testimony which had been taken, should be read in evidence in the same man-ner as if all the parties had regularly appeared and an-swered before it had been taken. The defendants agreed to release to the complainant all claim on the bond from *Garrett* to *Giles,* stated in the bill of complaint. The case was argued by counsel, and submitted.

Hanson, Chancellor, *(*22d December 1797.) The original bill had three objects, viz. For the complainant to be relieved on the ground of fraud and imposition against a bond by him passed, on a settlement of accounts, to the defendant; to have an account of the profits of certain works carried on in partnership, the complainant's share whereof was by him released in consequence of the same fraud and imposition; and lastly, as representative of another partner to have an account of the share of profits from which the said partner was arbitrarily excluded. The chancellor cannot omit to remark on the long conti-nuance of this cause. For many years the want of pro-gression appears to have been owing to the neglect of one or both of the parties. Abatement by death, then took place, in the ordinary course of human events. After a revival of the suit, a want of attention or negligence per-mitted another suspension of proceedings, and at length other deaths, with the operation of the descent law, ren-dered it extremely difficult, even with proper attention and exertions in those concerned, to have all proper par-ties before the court. This is not perhaps the worst con-sequence of delay. After such a lapse it was not to be expected that those facts which, in the beginning, living

witnesses might be produced to prove, can now possibly be established, when those facts are supposed to have taken place, at least fourteen years before the filing of the original bill. The truth is, that the complainant has produced nothing to be called proof, to establish the material allegations of the bill; although there are certainly circumstances to induce a suspicion of their truth. But however positive these allegations may be, those circumstances cannot be considered sufficient to set aside a bond passed in the year 1756, fourteen years before the date of the cause, on a settlement of accounts, after an investigation of several days between two men versed in business, neither of whom at the time, appear to have reposed any real confidence in the other. The chancellor then is clearly of opinion, that the complainant has shown no title to relief, as the executor of *Garrett*, on the ground of fraud and imposition, and if the complainant might still be permitted to surcharge and falsify the account on which it is supposed the bond was given, this could not be done without amending the bill, and pointing out the particulars; but to do this he has not thought proper to ask leave. With respect to the third object of the bill, the chancellor cannot think that the complainant, as administrator *de bonis non* of *Peter Dicks*, has established facts to entitle him to relief; although it is not improbable, that had *Dicks*, or his representative, brought suit sometime during the 16 or 17 years, which elapsed between the time when it is supposed he was injured by the arbitrary conduct of *Garrett* himself and *Giles*, and the date of *Garrett's* suit, he might have recovered something, either at law or in equity. On a most laborious and anxious investigation of this cause, the chancellor could not otherwise than feel a degree of distress and embarrassment. By the last act of the defendants' solicitor, he is enabled to do that, which probably arbitrators would have done thirty years ago, or at least do as much in the complainant's favour, as such arbitrators would have done. "It is agreed, that to facilitate the settlement of the cause, the defendants will release all benefit of the bond passed by *Garrett* to *Giles*;" and it is impossible, the chancellor conceives, that, at this time, on the proceedings in this cause, any tribunal whatever would decree more in the complainant's favour than by relieving him against that bond. Let the re-

1810.

Gover
vs
Hall

port of the respectable auditors in this cause, appointed by the agreement of the parties, be attended to. *Decreed,* that the injunction, heretofore issued in this cause, be revived, and that the defendants, and each of them, be and they are hereby perpetually enjoined not to proceed *at* law on the bond passed by *Amos Garrett* in the year 1756, against which the said *Amos,* by the original bill in this cause, prayed relief. Also that each party bear his own costs, &c.

From this decree the complainant appealed to the court of appeals.

THE COURT OF APPEALS, [*Rumsey,* Ch. J. *Mackall* and *Jones,* J.] at June term 1800, after hearing counsel upon the appeal—"*Decreed,* that the decree of the chancellor be reversed, and that the complainant be allowed the costs of his appeal. That the defendants account with the complainant, as executor of *Garrett,* for five twelfth parts, and with the complainant, as administrator *de bonis non* with the will annexed of *Dicks,* for two twelfth parts of the stock and profits of *Cornwall* furnace and *Hopewell* forge in *Pennsylvania,* from the 31st of December 1753, to the expiration of the lease on the 18th of June 1765, if stock shall have been taken at that time, if not, at such time thereafter as stock shall appear to have been first taken; and that the account of said stock and profits be stated by the auditor of the court of chancery. That the chancellor pass such decree and order as shall be necessary to have the account stated in manner aforesaid, and on return thereof to take such order, and pass such decree, as may be necessary to compel the defendants to pay to the complainant the amount of stock and profits found due to him in each of his capacities as aforesaid, with interest thereon from the 18th of June 1765, if stock shall have been taken at that time; if not, at such time thereafter as stock shall appear to have been first taken, till paid, and costs." In consequence of this decree the chancellor did, on the 23d of October 1800, by his order direct, that the defendant account with the complainant as by the decree of reversal is directed, and that the auditor state an account or accounts between the parties accordingly. The auditor made his report and statement of accounts to October term 1801. The defendant excepted to the auditor's

report upon various grounds. Some of the exceptions were ruled good by the chancellor, and the auditor was directed to correct his report. The auditor having corrected his report, the same was ratified by the chancellor, stating that there was due to the complainant from the defendants, on the 1st of August 1801, provided they have assets, &c. the sum of £44,818 11 6, in which sum interest is included to that day, and of which sum five parts of seven are due to the complainant as executor of *Garrett*, and the other two parts as administrator *de bonis non* of *Dicks*. The chancellor afterwards by his decree directed that each of the defendants account with the complainant for the amount or value of the property which is or hath been in his or her hands, and which hath come to him or her, claiming mediately or immediately under *Jacob Giles*, deceased, &c. Reports were accordingly made by the auditor. To which there were various exceptions. Some of which were allowed, &c. and the chancellor, on the 28th of November 1803, decreed, that *A. Giles*, one of the defendants, pay to the complainant the sum of £3,295 2 6, with interest from the 23d of October 1800; that *W. Smith*, one other of the defendants, pay to the complainant £2,500, with interest, &c. That *E. Giles*, one other of the defendants, pay to the complainant £750, with interest, &c. That *S. Gover* and wife, others of the defendants, pay to the complainant £717 3 9, with interest, &c. and that *Sarah Gover*, one other of the defendants, pay to the complainant £684 7 6, with interest, &c.

Gover, and wife, petitioned the chancellor for leave to appeal from the decree to the court of appeals; and filed a bond with sureties, to prosecute the appeal, &c.

HANSON, Chancellor, (December 23, 1803.) The chancellor has considered the petition of *Gover* and wife, and is clearly of opinion, after hearing the argument of the complainant's counsel, that an appeal properly lies in this case; and therefore that the defendants are entitled to have the prayer of their petition granted.

Nothing is better established in chancery than that an appeal lies from an interlocutory decree. It is true, that in this cause the chancellor formerly passed a final decree. But the judges of dernier resort, on an appeal, reversed his decree, and directed an account to be taken between the parties. They were of opinion then,

that the chancellor ought to have decreed an account as they have directed. Suppose the chancellor, instead of decreeing it, had not so decreed, would not the defendants have been entitled to appeal? But suppose the defendants not to appeal from that interlocutory decree, and to have suffered an account to be taken, on which the chancellor decreed, can there be any doubt that the defendants would have been entitled to appeal; or in other words, that an appeal would properly lie in that case, and execution be stayed on filing their bond?

What then, in point of principle, is the difference between that case and the present? Why does an appeal lie in any case, unless it be, that the opinion of the chancellor, if he does wrong, may be corrected. Is it impossible that the chancellor has erred in the present instance, notwithstanding he has pursued, as nearly as he could, all the directions of the court of appeals? Most assuredly it is not. The court of appeals has only directed a general account of profits from one period to another, and to allow the complainant a certain proportion. It did not say the chancellor shall direct *certain* sums to be charged to the complainant, other *certain* sums to the defendants, and the balance to be struck and paid to the complainant. Had it so done, it might well be said, that the chancellor might be certain he had pursued its directions, and therefore ought not to stay execution on a frivolous appeal.

It surely cannot be forgotten that the auditor hath made two statements, differing in their amounts many thousand pounds, and that the defendants' counsel excepted to both accounts. Is it possible to conceive, that when the court of appeals did not direct either sum to be decreed, and did not—could not prescribe certain things to be done, from which either of the amounts, or any other certain amount should arise, and when of course the court of appeals hath not given its direction; is it possible to conceive that the defendant is not entitled, on the usual terms, to have the opinion of that tribunal, before he is compelled to pay the money decreed against him? Is it to be supposed the intent of that court, to inform the chancellor there should be no appeal from his decision, merely because they directed him to have an account stated, and to decree the sum appearing due to be paid to the complainant, and to take proper measures for carrying his de-

cree into effect? Let it be supposed that the court had plainly expressed that meaning, and the chancellor to act in obedience to its mandate—what disinterested, impartial, intelligent person is there, that would not declare the common right of a citizen to be violated? It would, in such a case, be fruitless to allege that, as in contemplation of law, the decisions of the court of appeals must be right, it ought not to be supposed to have done wrong in any case whatever.

In a word, the chancellor is most decidedly of opinion, that although in no case will he disobey the plain directions of that tribunal, given on appeal from his decision, he cannot with propriety permit an execution to be taken out against the defendants, until its decree is obtained on the appeal, or unless the defendant shall fail to prosecute it agreeably to the condition of his bond, which the chancellor hath approved.

Most true it is, and much is it to be lamented on various accounts, that this cause hath continued a length of time equal to one half of a long life. For many years no steps was taken by either party; and it was even supposed to be abandoned on one side, and almost forgotten on the other. The chancellor wishes most earnestly an end of it. But had it continued thrice as long, he could not, for that reason, deprive the defendant of what he believes to be every defendant's right; notwithstanding that he is perfectly convinced of the rectitude of his last decree on the auditor's statement, which he considers as conformable to the principles contained in the decree of the court of appeals.

The appeal being granted, the record was transmitted to this court; and during the pendency of the appeal, the act of November 1809, ch. 87, passed, reciting that Samuel Gover. and others, had represented to the general assembly, that the above cause came on for trial in the late court of appeals at June term 1800; that Benjamin Rumsey, Benjamin Mackall and Thomas Jones, were the judges who signed the decree given in the cause, and that Benjamin Rumsey, at that time, was the presiding judge of the court, and that he declared, that being nearly related to one of the parties, he could not act in the usual manner, but that if he concurred in opinion with the other judges, he would sign the decree, so as to make up the legal number of judges required for constituting the court, and

which he did accordingly; and that the present court of appeals had ordered an argument how far the said decree was conclusive, and the petitioners had prayed that an act might pass authorising the court of appeals to hear and determine the matter of the decree of June term 1800, in the case, in the same manner as if that decree had never been made; and it appearing to the general assembly that the manner in which *Benjamin Rumsey* acted in signing the decree, without sitting in judgment in the case, was not in conformity to the spirit of the constitution; it was enacted, "that the court of appeals for the western shore be and they are hereby authorised, empowered and directed, to hear and determine the matter of the decree of the court of appeals of June term 1800, in the said cause, in the same manner as if that decree had never been made." By a supplement to the above act, passed at the same session, *ch.* 118, it was enacted, "that in the event of the court of appeals determining in the same manner as the former court of appeals, or determining that there should be an account, that then, or in either case, all the statements and proceedings that have taken place under the decree of June term 1800, shall be and they are hereby declared to stand before the court of appeals authorised to determine the case, in the same manner, and with the same effect, as if the act, to which this is a supplement, had not passed; provided nevertheless, that if the court of appeals should be of opinion that justice cannot be done between the parties by reason of the provisions of this supplement, that then and in that case they shall proceed in the same manner as they could or would have been authorised to have done if this supplement had not passed."

The appeal having been granted to this court, the cause was argued before Buchanan, Nicholson, Gantt, and Earle, J. by

*Shaaff*, *Harper*, *T. Buchanan* and *Winder*, for the Appellants; and by

*Martin*, *Key*, and *Johnson* (Attorney General,) for the Appellee.

Buchanan, J. delivered the opinion of the court. The case appears to be this—*George Churchman*, *Peter Dicks* and *Abraham Hare*, having possessed themselves of a

lease of certain iron works in the state of *Pennsylvania*, called *Cornwall Furnace* and *Hopewell Forge*, to continue until the year 1765, on the 13th of November 1750, took *Jacob Giles*, *John Hall* and *Amos Garrett*, into an equal partnership and interest with them in the works, in consideration of the sum of £1000 furnished by *Giles*, *Hall* and *Garrett*, to be repaid by *Churchman*, *Hare* and *Dicks*, with interest, at the end of five years, out of their proportions of the profits of the works, for which they passed their bonds.

In 1751 *Giles* and *Garrett* bought out *Hare*. In 1752 they purchased a moiety of another forge in *Pennsylvania* called *Talphahaken Forge*, and in the spring of 1753 they bought out *Hall* and *Churchman*, and thus became jointly possessed of one undivided moiety of *Talphahaken Forge*, and of five sixths of *Cornwall Furnace*, and *Hopewell Forge*.

On the 12th of June 1753, *Giles* and *Garrett* entered into new articles of copartnership for carrying on the business at the furnace and two forges, leaving out *Dicks*.

On the 13th of November 1753, another partnership was formed for carrying on the furnace and two forges, with several other branches of business, and *John Giles* and *Nathaniel Giles*, sons of *Jacob*, were taken into the concern on equal terms.

On the 12th of March 1756, the last partnership was dissolved, and a final settlement made between *Jacob Giles* and *Garrett*, in the presence and with the assistance of *David Caldwell*, when there appeared to be a balance against *Garrett* of £1106 14 1¼, current money, for which sum he passed his bond to *Giles* on the day of settlement, and also gave his bond to *Giles*, conditioned to quit claim to the iron works, and all stock and profits accrued or accruing therefrom; and *Giles*, on the same day, passed his bond to *Garrett*, conditioned to correct all errors in the settlement, if any should be discovered, to indemnify him against all partnership demands, and to pay him one half of all the debts that might be collected, which in the settlement had been considered dubious or desperate. The three bonds are all in the handwriting of *Garrett*, and attested by *David Caldwell* and *John Rigby*. From which time, until a short period before the filing the bill by *Garrett*, in 1772, he continued to officiate as clerk

and book-keeper to *Giles;* made at different times considerable payments on his bond for £1106 14 1½; and in February 1763, acknowledged in writing the account and settlement of 1756, reserving only the right to correct errors, if any.

By an act of the legislature this cause is placed in the same situation for decision in which it stood on the appeal from the decree of the chancellor of the 22d of December 1797, and presents two questions for the consideration of the court.

*First.* Whether the settlement of the 12th of June 1756, and the bonds passed by *Garrett* to *Giles,* shall be *opened* and set aside, and *Benedict Edward Hall,* as executor of *Garrett,* be entitled to an account of all the profits of the works from the year 1751 to 1765, *and be let in for any and what proportion of the profits?* And

*Second.* Whether as administrator *de bonis non* of *Peter Dicks,* he shall be let in for one sixth of the profits of the works for the same period?

With respect to the claim in right of *Garrett,* it is contended that the settlement and bonds of the 12th of March 1756, ought to be set aside on two grounds:

*First.* That they were procured by fraud, artifice, misrepresentation and threats; and

*Second.* That there are errors and mistakes in the settlement.

On the first ground of relief, it is alleged in the bill that *Giles,* becoming impatient of the rising fortune of *Garrett,* formed the fraudulent design of working him out of the concern, and of getting into his own hands the sole management and property of the works, and with that view artfully brought about the partnership of the 13th of November 1753, into which his two sons are stated to have been admitted as equal partners, without any consideration; and that in furtherance of the same project, *Garrett* was turned out of the management of the works, on the 1st of January 1754, and sent to *England* on a frivolous pretext, and *David Caldwell,* who is represented as the tool of *Giles,* and wholly devoted to his interest, appointed manager in his place.

But the fraud inferred from these transactions does not appear, and the intent ascribed to *Giles,* to embarrass and injure *Garrett,* seems to be an unfounded conjecture. The

1810.

Gover
vs
Hall

articles of the 13th of November 1753, afford no evidence of it, and it does not appear that *Garrett* was thereby injured. The allegation that *Nathaniel* and *John Giles* were taken into the partnership without any consideration, and with a view to overbear *Garrett*, is not supported. On the contrary, the articles refer to an annexed list of stock stated to have been put in by each of the parties, and contain an express stipulation that *Nathaniel Giles*, who was an infant, should have no vote in the affairs of the company until he arrived at age.

The charge that *David Caldwell* was the tool of *Giles*, and that *Giles*, in the year 1754, fell upon the expedient of appointing him manager at the works, for the purpose of ruining *Garrett*, is equally unsupported.

By the articles of the 12th of June 1753, it was stipulated that *Giles* should be at liberty to employ another bookkeeper at the end of the year, and by the articles of the 13th of November 1753, it was provided that a new clerk should be appointed on the 1st of January 1754.

These two agreements were entered into by *Garrett* with his eyes open, and the first of them at a time when no fraud is pretended to have been practised upon him. The appointment, therefore, of *Caldwell* as manager, who, it is in proof, was a man of unblemished character, will not bear the construction which is attempted to be given it. He was moreover, from the time of his appointment, on the most friendly and confidential terms with *Garrett*, as appears from their numerous letters of correspondence; and with respect to *Garrett's* mission to *England*, it appears to have been connected with their general scheme of trade; and the bill does not even state that there were any foul dealings in his absence.

The allegations in the bill that *Garrett*, on his return from *England*, wished to know the state of the works, but was put off with some trifling excuse, and that every transaction during his absence was concealed—that when he proposed to go to the works to examine the books, *Giles* alarmed him with fears that he would be arrested and imprisoned—that *Giles* peremptorily insisted on taking his son *Jacob Giles*, and son-in-law *Nathaniel Rigby*, into the partnership, and on his refusal took possession of some of the books, and ordered *Caldwell* to lock up the rest—that when he inquired of *Giles* to know the profits of the works

for the years 1754 and 1755, he was informed, they were sunk by the debts, and that the lands and works were involved beyond their value—that at the time of the settlement in 1756, *Giles* had in his possession a memorandum book, showing the clear profits of the works for the years ·1754 and 1755, to exceed £4000—that on his objecting to enter into a settlement on an account produced by *Giles* for that purpose, *Giles* abused him, and threatened him with a gaol, and that he was obliged to throw himself upon his mercy, and without examining the books or accounts, and ignorant of the state of the concern, he entered into the settlement and bonds of 1756—are all positively denied in the answer, and wholly unsupported by any proof exhibited in the cause. Nor is it probable that *Garrett*, who was a sensible discerning man, would under such circumstances of suspicion have entered into a settlement without an inspection of the books, which he was entitled to, when he could not suffer by delay, and it was not in the power of *Giles* to coerce him. Moreover, the circumstances that *Caldwell* was present and assisted at the settlement; that *Giles* offered to refer the whole business to arbitrators, who he knew would only act upon an inspection of the books; that after the settlement, he passed his bond to rectify mistakes, and continued *Garrett* in his employment as a clerk, until the year 1769, and thus put it in his power to discover the frauds and errors if any existed; that all the instruments of the 12th of March 1756, are in the handwriting of *Garrett* himself, and that he made frequent payments on his bond, irresistibly force the presumption that no fraud, violence or imposition, was practised.

The settlement then of the 12th of March 1756, must be taken to be fair, and if liable to any exceptions, it can only be on the ground of error or mistake; and the complainant can now only be permitted to surcharge and falsify, and that no further than the specifications in the bill. The *onus probandi* is on him—and after a voluntary settlement by the parties themselves, of long and intricate transactions, which cannot now be fully known or unravelled, the lapse of nearly sixteen years from the time of the settlement to the filing of the bill, the frequent payment of money upon the bond passed on the settlement, and the death of *Caldwell*, the only material witness, the

1810.
Gover
vs
Hall

surcharge or falsification must be clearly demonstrated and proved before it can be allowed.

In this case there are but three specifications. The bill states that *Garrett* was charged in the settlement with £313 11 1½, as his proportion of desperate debts, which *Giles* has since collected or received satisfaction for; that he was charged with £129 10 1½ as his proportion of the *Talphahaken* balance—whereas there was no such balance—and with £150 as his proportion of a debt on account of the *Talphahaken* works due *Price* & *Brenner*, which he had before settled and paid.

These items are contained in certain general charges in the account on which the settlement was made, but are not falsified by any evidence in the cause; besides, they are more than covered by the relief decreed by the chancellor against the bond on which an injunction has been granted by consent of counsel.

The bond to correct errors makes no difference—it only contains what the law provides without it—and unless errors are clearly designated and proven, the settlement must stand; and from a strict examination of all the proofs in the cause, it does not appear that there were any errors or mistakes in the settlement, or that *Garrett* was in any manner injured.

With respect to *Dicks*, it appears that he was left out of the copartnership of the 12th of June 1753—that on the same day an account was opened against him, in which he was charged with his proportion of the £1000, advanced by *Giles, Hall* & *Garrett*, with interest thereon.

On the 4th of August 1754, he made considerable payments in money on that account, and passed his note for the balance to *Giles* and *Garrett*, which was carried as a debit into his general account on their books. That on the 5th of November, 1754, he was credited by the amount of that note paid to the order of *Garrett*, and his account closed. From which time his name does not appear on the books. He died in the year 1760, and never claimed any interest in the partnership after the 12th of June 1753, and there is no evidence that he considered himself, or was considered by others, as a partner. After which acquiescence and lapse of time, connected with the circumstance of his paying off his proportion of the £1000 advanced by *Giles, Hall* and *Garrett*, a year before it became due, and

when, if he continued a partner, he would have been enti-
tled, under the contract, when it did become due, to set
off against it his proportion of the profits of the works, a
court of equity will presume that his interest was relin-
quished.

Upon the whole, therefore, I am of opinion, that *Bene-
dict Edward Hall* ought not to have an account of the pro-
fits of the works either in right of *Garrett* or *Dicks*; and
that the decree of the chancellor of the 28th of November
1803, ought to be REVERSED, and his decree of the 22d of
December 1797 AFFIRMED; and that the respective parties
in this appeal, and in the appeal before the late court of
appeals, pay their own costs by them incurred and expend-
ed in the court of chancery, in the late court of appeals,
and in this court.

EARLE, J. Concurred in the statement of facts, the rea-
soning and opinion of Judge *Buchanan.*

GANTT, J. also concurred, except that he considered
the decree of the chancellor of the 22d of December 1797,
erroneous, so far as a perpetual injunction was decreed
against the bond from *Garrett* to *Giles,* and that this court
ought to dissolve that injunction.

NICHOLSON, J. I am opinion in this case, that *Bene-
dict Edward Hall,* as executor of *Garrett,* is not entitled
to an account, there being no such circumstances of fraud
disclosed as ought to induce the court to open a settlement
voluntarily made by the parties sixteen years before the
bill was filed.

I am of opinion, that *Benedict Edward Hall,* as admini-
strator of *Dicks,* is entitled to an account, as it does not
appear *to me* that the evidence in the case is sufficient to
warrant the conclusion that *Dicks* ever withdrew from the
concern. Thinking, as I do, that *Dicks'* administrator is
entitled to an account of stock and profits, the necessary
consequence is, that I should decree the whole costs to be
paid by *Gover* and wife. But as the other members of the
court disagree with me in regard to *Dicks'* claim, and as to
costs, it follows that I cannot sign the decree of the court.

THE DECREE OF THE COURT. The arguments of coun-
sel in this cause having been heard, and the bill, answers,
and the proceedings in the case, read and considered, the

court are of opinion, that *Benedict Edward Hall* is not entitled to an account either in right of *Amos Garrett* or *Peter Dicks*. And the injunction granted by the chancellor, on the bond from *Garrett* to *Giles* of the 12th of March 1756, having been decreed by the consent of the counsel of the defendants in the court of chancery, appearing on record, it is thereupon, this 12th day of July, in the year of our Lord 1810, by the court of appeals, and the authority thereof, adjudged, ordered and decreed, that the decree of the chancellor of the 22d of December 1797, be and the same is hereby affirmed.

It is also adjudged, ordered and decreed, that the decree of the chancellor of the 28th of November 1803, be and the same is hereby reversed, annulled and made void.

And it is farther adjudged, ordered and decreed, that the respective parties in this appeal, and in the appeal before the late court of appeals, pay their own costs by them incurred and expended in the court of chancery, in the late court of appeals, and in this court.

> *Jno. Buchanan,*
> *Jno. M. Gantt,*
> *Rd. T. Earle.*