## JOSEPH M. DELLA RATTA v. WILLIAM E. DIXON ET AL.

[No. 281, September Term, 1980.]

*Decided November 14, 1980.*

The cause was argued before THOMPSON, MOORE and WILNER, JJ.

*Roy Niedermayer,* with whom was *Daniel M. Litt* on the brief, for appellant.

*Timothy E. Meredith,* with whom were *Robert W. Warfield* and *Corbin, Heller & Warfield, Chartered,* on the brief, for appellees.

WILNER, J., delivered the opinion of the Court.

On September 18, 1973, Joseph Della Ratta (appellant), William Dixon, Thomas Baldwin, and John Dixon (appellees) entered into a written agreement creating a general partnership known as OTC Associates. William Dixon, Baldwin, and Della Ratta were each to have a 30% interest in the company; John Dixon was to have the remaining 10%.

The purpose of the venture was to acquire and develop certain property in the Odenton Town Center, in Anne Arundel County. In furtherance of that aim, OTC, in fact, purchased certain real estate, borrowed $2,000,000 from Maryland National Realty Investors, Inc. (MNRI) to pay for it, and mortgaged the property to MNRI as security for the loan. The mortgage called for monthly amortization payments.

The pertinent parts of the partnership agreement, in terms of this case, are found in paragraphs 5, 4, 8, and 9. Paragraph 5 merely set out the percentages noted above, according to which the profits would be divided.

Paragraph 4 dealt with capital contributions. It provided, among other things, that:

(1) Each partner agreed "to contribute a percentage of all capital deemed to be necessary to the operation of the partnership business," in accordance with the percentages set forth in paragraph 5.

(2) Each partner "shall be responsible for contributing his respective percentage of any *additional* capital that may be deemed to be necessary to the operation of the partnership business within ten (10) days after receipt of notice of such additional capital requirement." (Emphasis supplied.)

(3) If a partner failed to contribute his respective share of additional capital contribution within the 10-day period, he "shall be in default."

(4) In the event of a default, the defaulting partner's interest could be purchased by any of the other partners at

a price fixed by the agreement. In the absence of such a purchase, however, the agreement provided that "any and all additional capital contributions then due shall be due and payable *and the partnership shall be entitled to collect from the defaulting partner by legal process the entire amount of all additional capital contribution or contributions then due"* together with interest at 8%, court costs, and reasonable attorney's fees incident to the collection. (Emphasis supplied.)

Paragraph 8 provided that the "death, insanity, or withdrawal" of a partner shall "work an immediate dissolution of the partnership; however, the dissolution of the partnership shall not terminate the partnership but the partnership shall continue until the winding up of the partnership affairs is completed and the liquidating of the partnership assets as provided for hereinafter is completed."

Finally, paragraph 9 dealt with termination. It provided that:

(1) Any partner may terminate the partnership prior to the end of the stated term [September 18, 1999] by giving 30 days notice of his intention to so terminate the partnership; and

(2) "In the event of a termination pursuant to this paragraph, or in the event of death, insanity or withdrawal of a partner, the remaining partners shall wind up the partnership affairs and liquidate the partnership assets" either by selling the assets and distributing the proceeds or by distributing the assets in kind.

No specific time limit was set on the winding-up and liquidation process.

On November 8, 1977, the partners amended the basic agreement to provide that,

(1) No requirement shall be made of any of the partners for capital contributions "for any purpose other than debt service on obligations secured by liens against the property of this Partnership and real estate taxes thereon unless and until each of the partners shall otherwise agree."

(2) For the period ending December 31, 1978, not more than $50,000 may be expended for partnership purposes in excess of requirements for debt service and real estate taxes without the further approval of the individual partners, and "[n]o partner shall be liable for additional capital contributions through the period ending December 31, 1978, for any purpose other than for his proportionate share of debt service and real estate taxes as aforesaid and of said sum of $50,000.00."

(3) The books of the partnership "shall be restated" to provide that all sums theretofore advanced by the partners "shall be designated as capital contributions. . . ."

(4) The partners "will make such additional capital contributions to the Partnership, not later than December 31, 1977, as shall be required to bring the total restated paid-in capital of the Partnership to $135,000.00."

The amendment made no reference to any period beyond December 31, 1978.

On November 7, 1978, appellant wrote to his co-partners William Dixon and Thomas Baldwin (but not to John Dixon) a letter "under the terms of Paragraph 9 of the Partnership Agreement. . . providing you with thirty (30) days written notice that it is my desire and intention to terminate the Partnership." The letter concluded, "You gentlemen, as remaining Partners, have the option to liquidate the Partnership assets by following either of the procedures stated in Paragraph 9 (a) or Paragraph 9 (b)." [1]

Notwithstanding this letter, appellant continued to contribute, in monthly amounts of $3,307.50, his percentage share of the additional capital needed to defray the debt service requirements of the partnership. This ceased, however, in May, 1979; no further contributions were made by appellant thereafter, either with respect to debt service or other expenses of the partnership, and, whether

---

1. Paragraph 9 (a) provided for sale of the assets and distribution of the proceeds; paragraph 9 (b) provided for distribution in kind.

coincidentally or not, no payments on the mortgage were made in June or July, 1979. On July 19, 1979, MNRI declared a default on the loan and demanded immediate payment of the accelerated principal and accrued interest.

Appellant commenced this action on June 11, 1979, with a bill of complaint in the Circuit Court for Anne Arundel County seeking an order declaring a dissolution of the partnership, ordering an accounting, winding-up, and termination of the partnership, appointing appellant to conduct the winding-up and termination, and restraining appellees from interfering with the partnership property or with appellant in his winding-up and termination of the partnership.

Appellees answered the bill, asserting that they had actively sought buyers for the partnership property in an effort to wind up the partnership, but had been unsuccessful. They also filed a counterclaim seeking multiple forms of relief. They referred to appellant's obligation under the 1977 amendment to contribute a 30% share toward the restated capital of $135,000, and alleged a deficiency on his part of $6,909.16.[2] They also noted his obligation to contribute toward not more than $50,000 of the general expenses of the partnership for the period ending December 31, 1978, and alleged his failure to make that contribution. Finally, they referred to his duty under the 1973 agreement to contribute a monthly sum of $3,307.50 toward the partnership's debt service obligation and claimed a default in that as well, thereby causing the partnership to become in default of its obligation. By these "willful and wrongful" failures, they claimed, appellant had "breached his fiduciary duties as a general partner."

Upon these allegations, they asked the court to (1) order a winding-up of the partnership affairs, (2) appoint them, as remaining partners, to conduct the winding-up, (3) require appellant to contribute his proportional share "for other

---

2. The averment of the amount of deficiency was indirect. They alleged that appellant's 30% share of the $135,000 was $40,500 and that, as of December 31, 1977, he had actually contributed only $33,590.84. The difference, of course, is $6,909.16.

partnership expenses which have been incurred, and will be incurred during the period required for winding up the partnership affairs," (4) enjoin appellant from interfering with the partnership property or with the winding-up of partnership affairs, (5) award appellees "ancillary damages for any losses they may have suffered as a result of [appellant's] wrongful acts and breach of fiduciary duties," and (6) grant other relief as the case may warrant.

Following the counterclaim, cross motions for partial summary judgment were filed. Appellees' motion, as viewed by the court, asked for an order requiring appellant to contribute his proportionate share of debt service requirements, a judgment of $26,460 for the eight-month existing deficiency in those debt service contributions (June, 1979, through January, 1980), and an order requiring appellant to contribute his proportionate share of other partnership expenses. After hearing argument of counsel, the court granted part of the partial relief sought by appellees. On January 29, 1980, it entered an order designating appellees to wind up the affairs of the partnership and recording a judgment against appellant for $26,460.

Although finding that appellant had a continuing obligation to contribute his share of the debt service requirements, it issued no order requiring such payments in the future, as requested by appellees. Nor did the court consider the question of appellant's obligation to contribute toward the other (non-debt service) expenses of the partnership, finding the matter to be in dispute. Nothing was said about ancillary damages, and no accounting was ordered. No injunctions of any kind were issued.

Appellant has appealed from this partial summary judgment, arguing that the court erred in entering a monetary judgment in advance of an accounting and in excluding him from participation in the winding-up process.

Interesting as these questions might be, they are not properly before us.

276

Maryland Rule 605a provides:

"Where more than one claim for relief is presented in an action, whether as an original claim, counterclaim, cross-claim, or third-party claim, the court may direct the entry of a final judgment upon one or more but less than all of the claims only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates less than all the claims shall not terminate the action as to any of the claims, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims."

Clearly, more than one claim for relief is presented in this action. Under the counterclaim, appellees' "possible recoveries are more than one in number and not mutually exclusive." *Diener Enterprises, Inc. v. Miller,* 266 Md. 551, 556 (1972), quoting from Barron and Holtzoff, 3 *Federal Practice and Procedure,* Rules Ed., § 1193, p. 28. Just as clearly, less than all of the claims have been resolved by the partial summary judgment from which this appeal is taken; and it is evident that no express determination of the kind mentioned in Rule 605a has been made by the court.

Appellant seeks to avoid the consequences of Rule 605a, at least with respect to the recording of a money judgment against him, by relying on Md. Ann. Code, Courts article, § 12-303 (c) (5).[3] Section 12-303 permits a party to appeal from certain types of "interlocutory orders entered by a

3. Neither party raised the issue of Rule 605a in his brief, but because it is jurisdictional in nature, it may be (and at oral argument was) raised by the Court. Appellant conceded at oral argument in response to the Court's inquiry that the order designating appellees to wind up the partnership affairs is not properly appealable at this time, in that it does not fall within the ambit of any of the enumerated types of interlocutory orders immediately appealable under § 12-303. He argued, however, that the money judgment was immediately appealable; and that is the point we shall now address.

circuit court in a civil case," among which is "(c) An order. . . (5) For the sale, conveyance or delivery of real or personal property *or the payment of money. . . ."* (Emphasis supplied.) His contention, simply stated, is that the recording of a partial summary judgment for money damages is "an order for the payment of money," and thus is immediately appealable under the statute, notwithstanding the Rule.

If appellant's position is a correct one, Rule 605a would be virtually meaningless. The Court of Appeals has made clear that if an appeal is allowed under § 12-303 (or its predecessor statutes), it may be taken without regard to the provisions or conditions of Rule 605a. The Rule, in other words, does not serve to preclude or limit an appeal permitted by the statute. See *Funger v. Mayor of Somerset,* 244 Md. 141 (1966); *also Washington Homes, Inc. v. Baggett,* 23 Md. App. 167 (1974), *cert. den.* 273 Md. 723 (1975). In light of the statutory preeminence, the potential emasculation of the Rule from appellant's theory becomes clear. The money judgment appealed from here related only to the period from June, 1979, to January, 1980. Presumably, additional judgments could be entered for each month after January on one or more of the several continuing claims, and separate appeals could be taken from each such judgment. The entire purpose of the Rule, of preventing piecemeal appeals and thereby avoiding the confusion, delay, and expense of having multiple appeals in the same case (*see Durling v. Kennedy,* 210 Md. 549 (1956)) would be wholly frustrated. We would get parts of cases and parts of issues, partial judgments on claims that might ultimately be offset by judgments not yet entered on counterclaims. The entry of partial summary judgment, rather than serving to expedite disposition of the case, may create an entirely opposite effect.

It is not pragmatism alone that leads us to reject appellant's position, however. It is rather a matter of statutory construction.

The term at issue is "an order for the payment of money." It is a term that is clear enough in most contexts, but not in the one before us. As to whether it includes a simple

judgment for money damages, it requires construction; and it is, to that extent, ambiguous. Thus, we must look for the legislative intent, and, in this instance, we must look for that intent in the legislative history of § 12-303.

The roots of § 12-303 are deep; they wander back into the early development of English common law and chancery practice and spring from one of the many differences between those parallel judicial systems, that pertaining to the right of appeal. Much of the relevant early history, in both England and Maryland, was summarized by Chancellor Bland in his first reported decision, *Ringgold's Case,* 1 Bland 5 (1824), and there is no need to repeat it all. Some discussion, however, is appropriate.

At "common law" — *i.e.,* prior to any statutory intervention — appeals were allowed only from judgments rendered by courts of law, and then only if the judgments were final ones. *See, for example, Boteler & Belt v. State,* 7 G. & J. 109, 113 (1835); *also Ringgold's Case, supra,* 1 Bland at 8; *Toland v. Sprague,* 12 Pet. (U.S.) 300 (1838); *Drowne v. Stimpson,* 2 Mass. 441 (1807); *Joslyn v. Sappington,* 1 Tenn. (1 Overt.) 222 (1805); *Smart v. Clift,* 2 Ky. (Ky. Dec.) 327 (1804). No appeal was permitted from orders or decrees of a court of equity, whether final or interlocutory. *Ringgold's Case, supra,* at 12. It was not, as Bland notes, until 1662 that "after having been much opposed, zealously debated, and maturely considered, [it] was finally settled and admitted to be as much a constitutional right to appeal from a decision of the High Court of Chancery, as from a Court of common law." *Id.* at 12.

The right of appeal from equity decrees was specifically conferred in Maryland by Act of the Provincial Assembly. *See* Act of 1718, ch. X; Act of 1720, ch. XX; Act of 1721, ch. XIV. The 1721 Act stated:

> "That from and after the end of this present session of assembly, it shall and may be lawful for any person or persons that shall conceive themselves aggrieved by any decree of the chancery court, to have an appeal to the governor and council

of this province for the time being, wherein each member shall have a full voice." [4]

Notwithstanding these statutes, law and equity did not remain in parity for very long. The very nature of equity practice and equity remedies demanded different rules, particularly with respect to interlocutory orders. Certain types of equitable orders, if not immediately appealable, could create manifest injustice to a party. Bland mentions some of these in *Ringgold's Case* (p. 13): an order which, if executed, would subject the party to some irreparable grievance, or one which could not be carried out without rendering the right of later appeal entirely nugatory. Yet, there was always the danger of delaying, and thereby frustrating, justice by freely allowing appeals from all interlocutory orders; there were some types of orders "from which no appeal ever has been, or ought to be allowed." *Id.* at 13.

Striking the proper balance was not easy. The 1721 Act (ch. XIV) accorded the right of appeal to one aggrieved "by any decree of the Chancery Court...," but it was not entirely clear whether that meant only final decrees, as was supposed by some, or included certain types of interlocutory orders, as was the practice in England. Bland suggests in *Ringgold's Case, id.* at 17, 18, that the Act was construed as applying only to final decrees, but in *Gover v. Hall,* 3 H. & J. 43, 47 (1803), Chancellor Hanson observed that "nothing is better established in chancery than that an appeal lies from an interlocutory order." The General Assembly did little to clarify the matter when it enacted 1785 Md. Laws, ch. 72, referring to "appeals from the decisions, orders, and decrees of the Chancery Court," or when it enacted 1818 Md. Laws, ch. 193, limiting appeals in equity to "decretal orders." Indeed, following the 1818 Act, the courts continued to render decisions "which are not easily reconcileable." *See*

---

4. At the time, the Governor and Council acted as the Provincial Court, exercising both original jurisdiction and appellate jurisdiction over decisions of the county courts. *See* Bond, *The Court of Appeals of Maryland, A History,* pp. 4, 5; *also* Act of 1713, ch. IV; *compare* 1776 Const., art. 56.

*Alexander's Chancery Practice,* p. 183, and the cases cited thereat; *also Miller on Equity Procedure,* § 301.

The General Assembly attempted to end this confusion in 1830 by eliminating entirely the right to appeal from interlocutory orders and finding another way to deal with the problem. By 1830 Md. Laws, ch. 185, it restricted appeals from equity to final decrees, but then added this *proviso:*

> *"Provided always,* that the execution of any decree or order of the chancery, or any county court for the sale, conveyance, or delivery of possession, of real or personal property, or the payment of money, or the bringing of money into court, or the appointment of a receiver, or the opening of any way public or private, from which the right of an immediate appeal is taken away by this act, shall not be suspended or staid, unless a prayer for an appeal be entered on the docket, or filed among the proceedings in the cause, and bond in such penalty as the chancellor, or county courts, (as the case may be) may prescribe, with good and sufficient security, to be approved by the chancellor or county court, shall be given."

This marks the first apparent delineation of these special types of interlocutory equity orders — including an order for the payment of money. The special treatment accorded them in this Act, in lieu of immediate appeal, was to permit the party subject to them to stay their effect *in the equity court* pending conclusion of the entire case.

This approach to the problem was itself modified eleven years later. By 1841 Md. Laws, ch. 11, the General Assembly amended the 1830 Act to provide,

> "That so much of the first section of the said act, as takes away the immediate right of appeal *from any decree or order of the court of chancery, or any county court sitting as a court of equity,* for the sale, conveyance or delivery of real or personal property, *or the payment of money,* unless such delivery or

payment be directed to be made to a receiver, to be appointed by such court, be, and the same is hereby repealed; and that *from any such decree or order* heretofore passed, or hereafter to be passed, *the right of an immediate appeal is hereby given."* (Emphasis supplied.)

By this Act, the General Assembly, for the first time, created specific distinctions *among equity decrees* for the purpose of appeal. In one sense, this merely reinstituted what had formerly been the *practice,* based upon the English experience, of allowing appeals from certain types of interlocutory orders but not others. The real significance is that it was now the Legislature that was deciding which types of orders could be immediately appealed and which types could not. It is important to note, however, that all of this pertained only to equity orders; none of these statutes applied to or affected appeals from law judgments. They had to be final to be appealable; that never changed.

The particular application of the 1841 statute to equity orders only was made clear in the 1860 Code — the first modern codification of Maryland statutory law. The statute was codified as part of art. 5 — "Appeals" — under the subtitle "Appeals From Courts of Equity." Sections 20 and 21 of that article and subtitle provided:

> "20. An appeal shall be allowed from any final decree, or order in the nature of a final decree, *passed by a court of equity; Provided,* such appeal be taken within nine months from the time of making such decree or order, and not afterwards, unless it shall be alleged on oath that such order was obtained by fraud or mistake.

> "21. *An appeal may also be allowed* in the following cases, to wit: From any order granting an injunction, or from a refusal to dissolve the same; or an order appointing a receiver, the answer of the party appealing being first filed in the cause; from an order dissolving an injunction; *from an order for the sale, conveyance, or delivery of real or personal*

*property, or the payment of money,* unless such delivery or payment be directed to be made to a receiver appointed by such court; or from an order determining a question of right between the parties, and directing an account to be stated on the principle of such determination." (Emphasis supplied.)

These sections remained substantially unchanged and intact for nearly a century. *See* 1888 Md. Code Art. 5, §§ 24, 25; 1904 Md. Ann. Code Art. 5, §§ 26, 27; 1912 Md. Ann. Code Art. 5, §§ 26, 27; 1924 Md. Ann. Code Art. 5, §§ 30, 31; 1939 Md. Ann. Code Art. 5, §§ 30, 31; 1951 Md. Ann. Code Art. 5, §§ 30, 31.

In 1957 the Legislature recodified the laws relating to judicial proceedings (1957 Md. Laws, Ch. 399); but, although it revised the language of § 21 and divided it into subsections, it left the substance more or less alone.[5] The statutory right of appeal from interlocutory orders appeared as § 7 of Art. 5, and remained limited to equity orders.

It was not until 1962, with the enactment of 1962 Md. Laws, ch. 36, § 5, that an appeal could be taken from an interlocutory order of a court of law. The Act specifically limited such interlocutory appeals, however, to orders "with regard to the possession of property with which the action is concerned or with reference to the receipt of or charging of income, interest or dividends therefrom or the refusal to modify, dissolve or discharge such an order." *See* 1957 Md. Ann. Code Art. 5, § 1A (1968 Replacement Vol.). Thus, in terms of orders for the payment of money, an interlocutory appeal remained available only when such an order emanated from a court of equity.

In 1970, the General Assembly reconfirmed that limitation when it reenacted § 7 of Art. 5, as it appeared in the 1957 Code. The occasion for its doing so was the switching of certain initial appellate jurisdiction from the

5. The Act did confirm the ability to appeal from orders denying or terminating certain types of relief, but made no change whatever in terms of orders for the payment of money.

Court of Appeals to this Court, which required a conforming amendment to § 7 in order to make clear that, to the extent the subject matter jurisdiction was in this Court, such interlocutory appeals as were permitted under the statute were to be made to us rather than to the Court of Appeals. *See* 1970 Md. Laws, ch. 99. With the limited exception provided by the 1962 Act, the statute still confined interlocutory appeals to equity orders of the enumerated types.

The statute in question assumed its present form with the enactment of the Courts article at the Extraordinary Session of the General Assembly in 1973. For the first time, reference is made to orders of a "circuit court," rather than to orders of a court of equity. The Revisor's Note to § 12-303 indicates the reason for the change. It states: [6]

> "Subsection (c) takes the provisions of Article 5, §§ 7 and 8A and combines them. Although most of the actions mentioned are in equity, *some relief, like an injunction, may also be obtained at law;* hence, no distinction is made between law and equity." (Emphasis supplied.)

Code revision is normally directed at updating and reorganizing the Code, harmonizing disparate provisions and eliminating inconsistencies that have crept into it over time — rather than making deliberate substantive changes in the law. It is therefore a well settled principle of statutory construction that "a change in the phraseology of a statute in a codification will not as a general rule modify the law, unless the change is so radical or material that the intention of the Legislature to modify the law appears unmistakably from the language of the Code." *Bureau of Mines v. George's Creek Coal and Land Co.,* 272 Md. 143, 155 (1974).

Clearly, from the Revisor's Note, a substantive change was intended in § 12-303, but not the one tacitly urged by appel-

---

**6.** The Revisor's Note appears in the Session Law and in the 1974 Volume of the Courts article; for some reason, Revisors' Notes were deleted in the 1980 Replacement Volume of the Courts article.

lant. It was recognized that some of the distinctions between law and equity, once sharp, had become blurred over time — that as a result various types of traditionally equitable remedies such as injunctions, could, in certain circumstances, be fashioned or provided by law courts as well as equity courts. *Where such orders were involved*— those which had been immediately appealable for more than a century — it should make no difference whether they emanated from a law court or an equity court. Their effect was the same and the reasons for allowing an interlocutory appeal were the same. In that context, the substitution of "circuit court" for "court of equity" is fully consistent with the Revisor's Note and marks a reasonable, and not very dramatic, change in the law.

To assume that a whole new class of orders — money judgments — was intended to be added to the list of appealable interlocutory orders is quite another matter, however. There is nothing in the Revisor's Note, or in the statute itself, to suggest that intention.

The types of orders mentioned in § 12-303 have a certain commonality. As we observed in *Flower World of America, Inc. v. Whittington,* 39 Md. App. 187, 192 (1978):

> "The common denominator of the exceptions [listed in § 12-303] is the irreparable harm that may be done to one party if he had to await final judgment before entering an appeal. Reversal of the final order because of the time expenditure involved in trial and appeal might 'rust the sharpest sword' and 'consume the strongest cord.' "

This is, in effect, the same judgment or concern noted by Chancellor Bland in *Ringgold's Case* and expressed by the Legislature in 1830 and 1841; and it is particularly applicable to the types of orders traditionally considered as being for the payment of money — alimony and child support (*Chappell v. Chappell,* 86 Md. 532 (1898); *Pappas v. Pappas,* 287 Md. 455 (1980)), for example, or an order to an assignee for the benefit of creditors to pay certain debts prior to a final adjudication of all the claims (*Genn v. C I T Corp.,* 40 Md.

App. 516 (1978)). *See also Womble v. Miller,* 25 Md. App. 656, *cert. den.* 275 Md. 758 (1975) (order to pay cost of deposition under threat of immediate dismissal with prejudice immediately appealable).

When, in such an instance, the court orders a person to pay a specific sum of money, that order proceeds directly to the person and he is directly and personally answerable *to the court* in the event of noncompliance. Not only his property, but his very liberty may be at risk; and yet, if the order is later shown to be in error and reversed, he is not necessarily entitled to recover what he has paid. *See, for example, Rand v. Rand,* 40 Md. App. 550 (1978).

Those characteristics, and consequences, are entirely lacking from a simple judgment for money damages, particularly a partial, interlocutory one. Such a judgment may settle the respective rights of the parties with respect to that claim by adjudicating that A owes B a certain amount of money, but it does not purport to order anyone to do anything. Unlike an order to pay alimony or child support, the judgment debtor is not answerable to the court for failing to discharge the judgment. At best, *if the judgment is a final one,* the court will assist the creditor in collecting the judgment out of the debtor's property.

Where the judgment is a partial one, however, even that collateral means of enforcement is unavailable.

The word "judgment" is a defined term in the Maryland Rules. It means (Rule 5 o) a "judgment at law, decree in equity and any other order of court *final in its nature."* (Emphasis supplied.) It is such a "judgment" — "final in its nature" — to which the Rules governing the effect and enforcement of judgments (Rules 619-623) must refer. But Rule 605a makes clear that a partial judgment, one rendered on less than all of the open claims, is *not* final; it remains subject to revision at any time before the entry of judgment adjudicating all the claims. It is therefore not one from which writs of attachment or execution may flow, either under the Rules or under the statutes. *See* Courts article, § 11-402.

This, of course, is the critical distinction. Unlike a true court order for the payment of money, a partial judgment for money damages is not immediately enforceable, and the debtor suffers no direct and irreparable prejudice from the lack of an immediate appeal.

It is for these reasons that we conclude that a simple money judgment, whether entered at law or in equity, is not "an order for the payment of money" within the meaning of Courts article, § 12-303 (c) (5). If it disposes of less than all of the claims before the court, it is governed by Rule 605a; and if, as here, it fails to satisfy the requirements of that Rule, it is not immediately appealable. See *Biro v. Schombert,* 285 Md. 290 (1979), in which the court, without discussing the precise issue raised here — the effect of § 12-303 (c) (5) — nonetheless flatly concluded that an appeal could not be taken from a partial summary judgment for monetary damages.

> *Appeal dismissed; appellant to pay the costs.*