486 A.2d 764

**Jack F. WALL**

v.

**Mary A. HELLER, Personal Representative of the Estate of Frank J. Wall.**

**No. 470, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

Jan. 11, 1985.

316

Jack F. Wall, pro se.

Edward C. Mackie, Baltimore (Glenn W. Trimmer, and Rollins, Smalkin, Richards & Mackie, Baltimore, on brief), for appellee.

Argued before BISHOP, ADKINS and BLOOM, JJ.

BISHOP, Judge.

Jack Wall, *pro se,* appeals the judgment entering directed verdicts in favor of appellee, Mary Heller, Personal Representative of the Estate of Frank J. Wall, on all issues framed by the Orphans' Court for Howard County and submitted to the Circuit Court for Howard County.

On December 7, 1978, Frank J. Wall ["Testator"], a resident of Howard County, executed a will, naming Mary Heller as Personal Representative. The will made several bequests to certain churches. In addition, $20,000 was bequeathed to both Agnes Schnell, appellee's mother, and Lore Scott-Smith, appellee's daughter. The rest and residue of the estate, after the payment of all taxes, debts and funeral expenses, was bequeathed to appellee, individually. The Testator died ten months later, on September 26, 1979, at the age of eighty-five. The will was offered for probate. Subsequently, appellant filed a Petition and Caveat in the Orphans' Court for Howard County alleging, *inter alia:*

1. That he was the nephew of Frank J. Wall and his only living heir.

2. That he was never notified of the Testator's death or the existence of the will.

3. That the Testator executed the will without sufficient mental capacity.

4. That the Testator signed the will without reading and/or understanding its contents.

5. That the will was procured by fraud.

6. That the will was procured by the exercise of undue influence upon the Testator.

On June 21, 1983, after prolonged procedural jockeying,[1] the Orphans' Court, pursuant to Md. Estates & Trusts Code Ann. § 2-105 (1984),[2] certified the issues of fraud, undue influence and lack of testamentary capacity to the Howard County Circuit Court for trial by jury.

Frank Wall was born and raised in Waterbury, Connecticut. He had a sister Mary and a brother Leo. Leo, who was 17 or 18 years older than Frank, moved away from home at the age of 12. Frank was born approximately 5 or 6 years after Leo left home. Neither Frank nor Mary ever married. Leo did marry, however, and had two sons, one of whom was Jack Wall. Leo's branch of the Wall family lived in Bridgeport, Connecticut, about 50 miles from Waterbury. Leo died in 1925 when appellant was an infant.

Mary and her brother Frank, the Testator in this case, lived together in Mary's Waterbury home until her death in 1962. In 1933, Agnes and Otto Schnell, appellee's parents, moved into an apartment on the second floor of the Wall residence. Otto and the Testator had been co-workers. The families became very close friends. The Testator was known to refer to Agnes and appellee as his "cousins." Appellee, Mary Heller, testified that during those early years of friendship, she had never heard of or seen either

---

1. For details see Section II infra.

2. § 2-105 provides in part
 (a) Determination of an issue of fact.—In a controversy in the court, an issue of fact may be determined by the court.
 (b) Transfer of determination to law court.—At the request of an interested person made within the time determined by the court, the issue of fact may be determined by a court of law. When the request is made before the court has determined the issue of fact, the court shall transmit the issue to a court of law.
 (c) Order based on determination.—After the determination of the issue, whether by the court or after transmission to a court of law, the court shall enter an appropriate judgment or decree.

Leo or Jack Wall. Otto Schnell died in 1953 and Agnes then moved in with appellee. After Mary Wall's death in 1962, Frank Wall continued to reside in the Waterbury residence until he sold it in 1965. Shortly thereafter, Testator moved to Maryland to live with appellee, who had previously moved there with her family. Until Testator became ill in 1977, he made frequent visits to Connecticut; however, he lived with appellee from 1965 until his death in 1979. Appellee testified that during the entire time the Testator lived with her, he never mentioned Jack Wall or received telephone calls or correspondence from him.

In 1977, the Testator began showing signs of illness. Records produced by appellant showed that doctors at Martinsburg, W. Virginia V.A. Hospital diagnosed the Testator as suffering from numerous physical problems, most notably heart and liver disease. The Testator was a "heavy drinker." He was discharged from the hospital in December of 1977, only to return in February of 1978. At this time the diagnosis was similar: arteriosclerotic heart disease with congestive heart failure. There was an additional diagnosis of cerebral sclerotic confusion. The Testator remained in the hospital through April. Despite contrary indications in the hospital records, appellee denied that she told hospital personnel that she would welcome the Testator home if he would "act less confused...." She also denied saying that the Testator had taken to roaming around outside at night and eating to the point of nausea. During this hospital stay, the Testator granted appellee a power of attorney because, according to appellee, he was too lazy to take care of his own affairs. Upon discharge, in April, doctors placed the Testator on medication, including Elavil, a mood elevator. Appellee testified that the Testator did not complain of dizziness, drowsiness or forgetfulness as a result of the medication.

The Testator was admitted to Howard County General Hospital in June of 1978. Hospital records noted that he was oriented to person and place, knew the month and year, and the president's name. The intake physician noted the

"impression" that the Testator was suffering from congestive heart failure, arteriosclerotic heart disease and senile dementia, a progressive brain disorder. He was discharged within three days.

Jean C. Steves, a Howard County community health nurse, testified that as part of her work with Home Health Services and geriatric evaluation, she was assigned to the Testator. She began visiting him at appellee's home in July of 1978. From July through December of 1978, she saw him one to two times a week for 45 minutes to an hour each time. During the visits she would take his blood pressure and review his vital signs and medication routine. She would also test his mental orientation, alertness and awareness, by questioning him as to time, place and current events, and through general conversations.

She described the Testator as a nice, gracious man with a fine sense of humor who was very content at home. He did not appear confused to her. In fact because she concluded he was stable, visits were terminated on December 31, 1978. Mrs. Steves admitted, however, that there was a marked change in his mental alertness and orientation during the last two weeks in December of 1978, when he became somewhat confused. His physical condition also deteriorated and at the end of December, she called his doctor for consultation.

Mrs. Donna Rawlings, a lay minister, testified that she visited Mrs. Schnell periodically from 1977 to 1981. During her visits she became better acquainted with the Testator. She testified that although his physical condition deteriorated, he remained mentally cogent and intelligent.

Robin Palmer Horton, a neighbor of the Heller's, testified that she knew the Testator and the Heller family through her friendship with appellee's daughter, Lore Scott-Smith. She described the Testator as a likeable, friendly person. According to Mrs. Horton, in early December, 1978, in response to Testator's request, she visited him. At that time he told her that he wished to make a will, and request-

ed that Mrs. Horton, a legal secretary, ask one of the attorneys for whom she worked to prepare one for him. He told her the persons he wished to be named and the amounts he wished to leave them. Appellee was not present during these discussions. Mrs. Horton took notes and forwarded them to Mr. Rollins, an attorney in her office. Based on her notes, Mr. Rollins dictated a will on tape and Mrs. Horton transcribed it. The notes were then destroyed and the tape erased. On December 7, 1978, after the will was completed, Mrs. Horton took the completed will to the Testator's home. Previously she had read it to him over the telephone. At the house the Testator read the will and told Mrs. Horton that it was what he wanted. He then signed the original and one copy in her presence and in the presence of Mrs. Horton's mother, Ina Palmer. Mrs. Horton and Ina Palmer were attesting witnesses to both documents. Appellee was not present in the room at the time the will was executed. In court, Mrs. Horton identified a copy of the will as that which she witnessed on December 7th. She testified that on that day the Testator was "perfectly normal" and as alert as any other day. She also stated that no one was present suggesting what the will should contain.

Mary Grimes, the Register of Wills for Howard County, brought to court and identified an original and certified copy of the December 7th will as the Last Will and Testament of Frank J. Wall. The court admitted the certified copy into evidence.

On December 28, 1978, shortly after the Testator executed his will, he entered Howard County General Hospital once more. According to appellee, his health had taken a "sharp downward course." Hospital records indicated he was suffering primarily from heart failure. He was also diagnosed as having "Depressive Syndrome." Hospital personnel noted that the Testator was unreasonable, uncooperative, hostile and belligerent during his stay, with poor recollection, disorientation and slow cerebral reaction. Regarding this behavior, appellee explained that Testator was

an independent man who did not like hospitals and that it confused him to wake up in a hospital after being at home. The Testator was discharged on January 9, 1979, only to be readmitted on February 21, 1979. Hospital records noted that, besides congestive heart failure, Testator was suffering from chronic brain syndrome. Appellee denied knowledge of any of the diagnoses regarding the Testator's mental condition. Thereafter, the Testator lived in and out of institutions for the remainder of his life. When able, he conducted his own affairs.

Appellant testified that he had a close, loving relationship with the Testator and that he had visited with him at times, but that he kept in touch primarily through his mother. He admitted never writing or calling the Testator. Appellant stated that when he was a child, the Testator used to stand in his house and tell appellant "one day it will all be yours." He also stated that the Testator loved appellant's children, particularly the boys, who would carry on the Wall name. He stated that the Testator sent them gifts in 1973; a fact which appellee denied. Appellant testified that the Testator was a Catholic and that at the time he executed his will (which provided for Testator's cremation), cremation was unacceptable to the Church. Appellant also testified that he did not hear of his uncle's death until he saw his tombstone during a visit to the family cemetery plot. He denied knowledge that the Testator lived in Howard County from 1965 to 1979, and offered into evidence a certified voter list showing the Testator was a registered active voter in Waterbury, Connecticut until 1977. Appellant also introduced into evidence the Testator's medical records, the power of attorney and related documents, and a letter from appellee to a Mr. Shane, dated March 13, 1979, in which appellee complained about the Testator's roaming around in the middle of the night in a confused fashion.

At the conclusion of the testimony of the register of wills and the attesting witnesses, the court ruled that appellee had established a prima facie case of the validity of the will.

At the close of all evidence, the court granted a directed verdict on each issue certified from the Orphans' Court, finding no evidence whereby a jury could conclude that the will was not read by the Testator or signed by him in the presence of two credible witnesses. The court also found no evidence "that [the will] was procured by undue influence; that the document was executed when he was not of sound and disposing mind, ... [or, that the will] was procured by fraud. There's [also] no evidence ... that the document dated December 7, 1978, was not the Last Will and Testament [of Frank Wall]." The record did not show whether the judge read appellant's exhibits. The March 1, 1984 docket entry shows that the court answered all issues adversely to appellant.

Appellant noted an appeal from "the order entered March 1, 1981," and asks:

I. Did the trial judge err in entering a directed verdict in favor of appellee?

II. Did the trial judge err in his rulings on discovery?

■ As a preliminary matter, we address, *nostra sponte*, the question of our jurisdiction, in order to clarify the point at which a circuit court order in an Est. & Trusts § 2–105 plenary proceeding becomes an appealable final judgment. As set forth previously at note 2, *supra*, § 2–105 authorizes the Orphans' Court to certify issues of fact to a court of law for trial. In answering the issues certified to it,

> The circuit court acts, strictly speaking, not as an appellate court nor in the exercise of original jurisdiction. It acts rather as ... "a tribunal ancillary to the orphans' court, whose aid is invoked for the single purpose of determining issues of fact submitted to it by the orphans' court for its guidance in dealing with some matter before it.

*Ades v. Norins,* 204 Md. 267, 273, 103 A.2d 842 (1954) (quoting *Holland v. Enright,* 167 Md. 604, 607, 175 A. 466 (1934)). Once the law court answers the certified issues, § 2–105(c) directs the orphans' court to enter the appropri-

ate judgment or decree. The circuit court has no jurisdiction to enter judgment on a certified case, and any attempt to appeal a purported judgment "is a mere futility." *Syfer v. Dolby*, 182 Md. 139, 152, 32 A.2d 529 (1943). At first blush it would appear from the language of § 2–105(c) that the law court's determination of the certified issues would not be a final judgment, since judgment can only be entered by the orphans' court. This, however, is not the law.

Until 1973, appeals were governed by Article 5 of the 1957 Maryland Code. Section 2 of Article 5 provided:

§ 2. Appeals from decisions on issues from a orphans' court

Any party may appeal to the Court of Appeals from a *decision, determination or ruling* of a court of law to which issues have been sent from an orphans' court to be tried.

Md.Ann.Code 1957, art. 5, § 2 (1968 Repl.Vol.) (emphasis added). In 1973 the legislature, as part of the enactment of a new courts and judicial proceedings article, repealed Article 5 on appeals and enacted in its stead Courts & Judicial Proceedings, Title 12, on appeals, certiorari and certification of questions. *See*, Code 1957, art. 5 (1975 Supp.).

New Section 12–301 provided, in part:

§ 12–301 Right of appeal from final judgments—Generally.

... a party may appeal from a final judgment entered in a civil or criminal case by a circuit court. The right of appeal exists from a *final judgment entered by a court in the exercise of original, special, limited, statutory jurisdiction,* unless in a particular case the right of appeal is expressly denied by law. (An.Code 1957, art. 5, §§ 1–3, 5, 6, 8, 12, 13, 19; 1973, 1st Sp.Sess., ch. 2, § 1.)[3] (emphasis added).

---

**3.** "Judgment" means judgment "at law, decree in equity, and *any other order of court final in its nature.*" M.R.P. 5 § 0 (1984) (emphasis added); *see also,* Cts. & Jud.Proc. § 12–101(f).

The revisor's notes at the end of the section, *supra*, clearly express the intent that § 12–301 absorb and encompass former Art. 5 § 2 appeals from decisions on issues certified by the orphans' court. The legislature further expressed its intent not to alter prior substantive law with the enactment of the new Courts & Judicial Proceedings Article, by stating in the preamble that the article was designed to "revise, restate and recodify the laws ... pertaining to courts and proceedings therein," 1973 Md.Laws, Spec.Sess., ch. 2. *See, Della Ratta v. Dixon,* 47 Md.App. 270, 283, 422 A.2d 409 (1980).

Lest there be any remaining confusion, we now expressly hold that a determination by a circuit court of issues certified to it by the orphans' court, pursuant to Est. & Trust § 2–105,[4] is an appealable final judgment under Cts. & Jud.Proc. § 12–301. In addition, there need be no express order by the circuit court judge transferring the case back to the orphans' court for entry of judgment. The act of the clerk in entering the determination of the issues on the docket is sufficient to show the final act of the circuit court. *See, Waters v. Waters,* 28 Md. 11, 24 (1867).

## I.

### Propriety of Directed Verdict

In determining whether the evidence in a caveat case was sufficient to go to the jury, "all conflicts in the evidence must be resolved in favor of the caveator ... and the court must assume the truth of the evidence produced on [his] behalf as well as all reasonable inferences that may be drawn from the evidence." *Ingalls v. Trustees,* 244 Md. 243, 247, 223 A.2d 778 (1966) (quoted in *Webster v. Larmore,* 268 Md. 153, 168, 299 A.2d 814 (1973) and *Friedel v. Blechman,* 250 Md. 270, 286, 242 A.2d 103 (1968)). As more

---

**4.** § 2–105(c) provides

After the determination of the issue, whether by the court or after transmission to a court of law, the court shall enter an appropriate judgment or decree.

fully discussed below, the appellant's evidence was insufficient on all issues and the judgments below should be affirmed.

A. *Issues 1, 2 and 6—Validity of the Will.*

The trial judge found that appellee established a prima facie case that the Testator's will was valid and properly executed. Appellant offered no evidence to refute the will's facial validity and expressly noted below that he had no objections to this ruling. Accordingly, we need not review a claim that the ruling was erroneous. M.R.P. 1085.

B. *Testamentary Capacity.*

■ A will, although facially valid, cannot stand unless the testator was legally competent. Md.Est. & Trusts, Code Ann. § 4-101 (1974); *Davidove v. Duvall,* 160 Md. 345, 352, 153 A. 417 (1931).

> Whether a testator had sufficient mental capacity is determined by a consideration of his external acts and appearances. It must appear that at the time of making the will, he had a full understanding of the nature of the business in which he was engaged; a recollection of the property of which he intended to dispose and the persons to whom he meant to give it, and the relative claims of the different persons who were or should have been the objects of this bounty.

Sykes, *Contest of Wills in Maryland,* § 61, p. 72 (1941); *Webster v. Larmore,* 268 Md. at 166–7, 299 A.2d 814 and cases cited therein. Moreover,

> [t]he law presumes that every man is sane and has capacity to make a valid will, and the burden of proving the contrary rests upon those who allege that he lacked mental capacity. *Cronin v. Kimble,* 156 Md. 489, 494, 144 Atl. 698, 700 (1929); *Smith v. Shuppner,* 125 Md. 409, 417, 93 Atl. 514, 517 (1915) . . . [I]n the absence of proof a prior *permanent insanity,* it must be shown that the testator was of unsound mind *at the time the will was executed in order to overcome the presumption of*

*sanity.* [*Acker v. Acker*] 172 Md. 477, 192 Atl. 327 (1937); *Gesell v. Baugher,* 100 Md. 677, 60 Atl. 481 (1905). *Arbogast v. MacMillan,* 221 Md. 516, 523, 158 A.2d 97 (1960) (Emphasis added); *Sykes, supra,* § 63, pp. 76–78. Therefore, the issue on appeal is whether appellant met his burden of production below. If not, the court correctly granted appellee's motion for directed verdict.

Evaluating the evidence in the light most favorable to appellant, it appears the Testator was suffering from a variety of physical and mental afflictions associated with old age. In April of 1978, he was diagnosed with having "cerebral sclerotic confusion;" confusion stemming from hardening of the arteries in the brain. Steadman's Medical Dictionary, p. 1428 (2d Ed.1966). In the hospital two months later, in June, the Testator conveyed the "impression" he was afflicted with "senile dementia;" a "progressive mental deterioration, with loss of memory, especially for recent events, and occasional intercurrent attacks of excitement, occurring in the aged." Steadman's, *supra,* p. 421.

> It is progressive in character, and in its advanced stages "the brain is well-nigh stripped of its functions," and it results in profound general mental incapacity. It is one of the most difficult questions of mental capacity; not because the law on the question is doubtful, but because it is so difficult to determine the point in its progress at which the faculties are so far impaired that they fall below the standard of legal capacity.

1 Page, *The Law of Wills,* § 12.27.

Because the disease is progressive, "the standard of legal capacity in cases of senile dementia is the same as the general standard for testamentary capacity.... If his mental capacity measures up to the test, he may make a will, even though he presents some symptoms of senile dementia." *Id.* The Maryland Courts are in accord with this rule and hold that:

[e]vidence that the person has a disease which may or may not eventuate in mental disease cannot prove, or standing alone tend to prove, that at a given point of time he is actually so afflicted. The tendency to mental infirmity, cannot per se prove the infirmity, it must be shown by facts.

*Webster v. Larmore*, 268 Md. at 167, 299 A.2d 814, (quoting *Horner v. Buckingham*, 103 Md. 556, 563, 64 A. 41 (1906)); *Sellers v. Qualls*, 206 Md. 58, 67–68, 110 A.2d 73 (1954). Accordingly, "where the evidence fails to show that at the time of the execution of the will the senile dementia had progressed to the extent that it deprived the testator of intelligent action, there is no submissible issue of testamentary capacity." 95 C.J.S. § 462B 2 (1957); *see, e.g., In Re Johnson's Estate*, 222 Iowa 787, 269 N.W. 792, 797 (1936) (Evidence that testator was in advanced stages of senile dementia one year after will executed and that prior to execution, testator showed signs of forgetfulness, uncleanliness, inability to transact business and general mental deterioration held insufficient to send issue of capacity to jury.)

■ Evidence tending to establish incompetency may relate to periods preceding or succeeding the execution of the will; however, the evidence must reasonably relate to the date of execution. *Webster v. Larmore*, 268 Md. at 164, 299 A.2d 814, 22 M.L.E., Wills, § 17, pp. 138–9 (1962). In the case *sub judice*, appellant presented evidence that in late December, 1978, three weeks after the will was executed, the Testator showed signs of poor memory and slow cerebral reaction. He was diagnosed as having "chronic brain syndrome." Mrs. Steves, the Testator's visiting nurse, testified that he appeared somewhat confused during her late December visits.

■ Taken as a whole, appellant's evidence presents a picture of an elderly man, afflicted with physical and mental infirmities associated with old age which resulted in some confusion and behavioral oddities. Such evidence falls

short of that required to show that *at the time the will was executed,* the Testator's afflictions rendered him incapable of understanding "the nature of the business in which he was engaged; ... the property ... which he intended to dispose and the persons to whom he meant to give it, and the relative claims of the different persons who were or should have been the objects of his bounty." *Sykes, supra,* § 61. Appellant presented no evidence of a prior permanent insanity. Since he also failed to refute appellee's evidence that at the time of the will's execution the Testator was coherent, lucid and possessed full understanding of his actions, appellant's evidence was insufficient to overcome the presumption of sanity. Therefore, he presented no issue for the jury. *Webster v. Larmore,* 268 Md. at 165, 299 A.2d 814.

■ It is somewhat disturbing that the record does not indicate that the judge read the Testator's hospital records, prior to granting the directed verdict. Appellant contends that this was error. Portions of their contents, however, were brought in through testimony and heard by the judge. In addition, since their contents were insufficient to override the presumption of competency, the trial judge's failure to read the records prior to ruling did not prejudice appellant's case.

## C. *Undue Influence.*

■ A will executed under undue influence is void. *Woodruff v. Linthicum,* 158 Md. 603, 608, 149 A. 454 (1930). Appellant contends that since appellee, a lifelong friend of the Testator, obtained a power of attorney from the Testator, had primary control over his financial and physical well being, and was in another part of the house when the Testator gave instructions for and later signed his will, she "had complete dominion over Frank Wall, and he had no free agency."

The Maryland law in regard to the required proof to establish undue influence vitiating a will was well stated

by Judge (now Chief Judge) Hammond, for the Court, in *Stockslager v. Hartle*, 200 Md. 544, 547, 92 A.2d 363 (1952), as follows:

> [U]ndue influence which will void a will must be unlawful on account of the manner and motive of its exertion, and *must be exerted to such a degree as to amount to force or coercion*, so that free agency of the testator is destroyed. The proof must be satisfactory *that the will was obtained by this coercion* (although it need not be immediately exercised as of the date of the execution of the will if its influence causes its execution) or by importunities which could not be resisted, so that *the motive for the execution was tantamount to force or fear. Mere suspicion that a will has been procured by undue influence, or that a person had the 'power unduly to overbear the will of the testator' is not enough.* It must appear that the power was *actually exercised,* and that *its exercise produced the will.* The *burden of proof is on the caveator to meet these requirements of the law.* (Emphasis supplied).

*Shearer v. Healy,* 247 Md. 11, 23, 230 A.2d 101 (1967).

In order to warrant the submission of the issue to the jury, the burden was on appellant to produce "some evidence from which it might be rationally inferred that at the time of the making of his will the Testator was under the domination of an influence which prevented the exercise of his own judgment...." *Arbogast v. MacMillan,* 221 Md. at 521, 158 A.2d 97 (quoting *White v. Bramble,* 124 Md. 395, 400, 92 A. 763 (1914)). In *Arbogast* the caveators produced evidence that the testator had lived with the caveatee rent free. The caveatee looked after the testator's physical needs and attended to his business affairs. In addition, the caveatee took the testator to execute his will and dispose of a prior will. The Court held these facts fell far short of undue influence.

On the contrary, these facts do not even raise a conjecture or a suspicious circumstance, and clearly did not

justify submission of the issue of undue influence to the jury ... Moreover, even if we assume that the [caveatee] did in fact have the power to overbear the will of [the testator], there is absolutely no evidence that the [caveatee] ever undertook to exercise it.

*Id.* (citation omitted).

 While the evidence in this case indicated that appellee was in a confidential relationship with the testator, such relationship is only one relevant fact, insufficient in and of itself to shift the burden to the caveatee to show a lack of undue influence. *Sellers v. Qualls,* 206 Md. at 72, 110 A.2d 73. Similarly, evidence of the testator's age and infirmity is relevant to the extent that it made him more susceptible to undue influence. Here, however, there is evidence that despite his infirmities the Testator, at the time he executed his will, was an independent and intelligent man.

 Appellee was not present either during the Testator's discussion about his will with Robin Palmer Horton or when the will was executed. *Friedel v. Blechman,* 250 Md. at 286–7, 242 A.2d 103. Appellant does not contend there was an illicit relationship between the Testator and appellee, and there was no evidence that the bequests to appellee and her family were unnatural, given their longtime, close association. The Court has held, however, that "neither [an illicit] relationship nor an unnatural disposition of property is sufficient *per se* to warrant a conclusion of undue influence." *Stockslager v. Hartle,* 200 Md. at 552, 92 A.2d 363, *Shearer v. Healy,* 247 Md. at 25, 230 A.2d 101. As in *Arbogast,* we hold that evidence showing that the testator lived with appellee and that appellee took care of his physical needs and his financial affairs falls far short of what is necessary to warrant submission to the jury. At best, the evidence raised only a suspicion or possibility of undue influence which is simply not enough. *Friedel,* 250 Md. at 287, 242 A.2d 103; *Sellers,* 206 Md. at 74, 110 A.2d 73. The granting of a directed verdict was proper.

## D. *Fraud*

As in the case of undue influence, a will obtained by fraud is void. *Woodruff v. Linthicum*, 158 Md. at 608, 149 A. 454. "Fraud connotes that the testat[or] either did not know that [he] was signing a will, or that [he] was misled or deceived as to the provisions of the will." The record is utterly devoid of evidence that the testator did not know, on December 7, 1978, that he was signing a will or that he was misled or deceived as to its provisions. Quite to the contrary, there was testimony that he read the will, was satisfied with its contents, and signed it with full knowledge and understanding of its provisions. There was no issue for the jury.

## II.

### Discovery

## A. *Jurisdiction*

Appellant contends that the Circuit Court, acting as an ancillary arm of the Orphans' Court, was charged with the limited task of trying the issues certified to it. He argues that the Court had exceeded its jurisdiction when it ordered "no additional discovery and ... no discovery without leave of court." It is clear from the record that, at the time of this order, very late in the course of this case, appellant's trial counsel had yet to undertake any formal discovery.

M.R.P. 1 a 1 provided:

Chapters 1, 100–600

The Rules in Chapter 1, apply to *all procedure* in courts of this state, but not the District Court. (Emphasis added).

Under Md.Cts. & Jud.Proc.Code Ann. § 1–501 (1984):

The circuit courts are the highest common-law and equity courts of record exercising original jurisdiction

within the State. Each has full common-law and equity powers and jurisdiction in all civil and criminal cases within its county, and all the additional powers and jurisdiction conferred by the Constitution and by law, except where by law jurisdiction has been limited or conferred exclusively upon another tribunal.

Clearly the court had jurisdiction to make an order regarding discovery. *See, Baltimore Transit Co. v. Mezzanotti*, 227 Md. 8, 13–4, 174 A.2d 768 (1961).

### B. *Orders Pertaining to Discovery*

On January 11, 1984, the Circuit Court entered an order prohibiting discovery without leave of court. As his reason, the trial judge stated: "[t]his matter has been pending for some period of time [and it would seem to me] that there would be no need for additional discovery. I don't know that I need say anything else." Indeed, close to three and one-half years had passed since September 26, 1980, the date on which appellant filed his caveat. From September 1980, until January 1983, the parties litigated the timeliness of appellant's petition, and thus, his ultimate right to a trial on the merits. The litigation was complete with motions, memoranda, and appeals to two courts. In January 1983, this Court dismissed an appeal taken by appellee for failure to file the necessary prehearing information. In April 1983, the orphans' court reappointed appellee as Personal Representative of the Estate of Frank J. Wall. Also in April, the parties obtained a June 14th hearing date. Consequently, not until April 1983, did it appear that appellant would finally get his "day in court" to litigate the merits of his caveat.

Although, in June of 1983, shortly before the hearing, appellant's trial counsel subpoenaed the Testator's doctors as well as all his medical records, at no time during the pendency of the action in the orphans' court did counsel

note deposition, file interrogatories or undertake other discovery pursuant to M.R.P. 400–425 and Est. & Trusts § 2–104.[5]

On June 21, 1983, the orphans' court ordered that stipulated issues "be sent to the Circuit Court for Howard County to be tried by a jury"[6] and in August the circuit court docketed the original papers from the orphans' court.[7] The circuit court, however, failed to set a trial date. In December, the attorneys agreed to try the case on January 11, 1984, but at that time appellant obtained a release of his counsel and requested a continuance on the ground that his attorney had not prepared a case. The record shows no formal discovery between August 1983 and January 1984. The court granted a continuance, but nevertheless closed discovery.

On February 16, 1984, thirteen days before the new trial date, appellant's new counsel moved to reopen discovery, alleging that "no formal discovery [had] been conducted in the case, although this case has been pending for over three years," that appellant would be "irreparably damaged in presentation of his case, unless appropriate discovery can be had, including depositions," and that appellant "should not be penalized by a denial of discovery." This motion and the accompanying motion for a continuance were denied.

At some point before the case came to trial in February, appellant received the hospital records which he had subpoenaed the previous June. Appellant also obtained records from the V.A. Hospital in Martinsburg, W. Virginia for which the record shows no subpoena. In addition, appellant

---

**5.** § 2–104. Application of Maryland Rules; ...

 (a) Maryland Rules as to summons, depositions, and discovery, apply to all actions.

**6.** See footnote 2, page 2.

**7.** The law case, # 12809, was consolidated with the prior Circuit Court Appeal, # 11061.

had subpoenaed documents pertaining to appellee's power of attorney, but when appellee failed to produce them the court, on February 22nd, ordered that she produce the documents on the day of trial. Appellee complied. At no time prior to trial did either of appellant's attorneys seek leave of court to obtain specific discovery.

A liberal reading of appellant's brief discloses two allegations of error: first, with regard to the judge's order prohibiting discovery without leave of court and second, regarding his subsequent refusal to reopen discovery.

Md.Rule 400a provides, "the court may at any time order that discovery in an action be completed by a specific date or time, which shall be a reasonable time after the case is at issue." It is well established that discovery rules "are to be liberally construed. And the trial judges, who are primarily called upon to administer said rules, are vested with a reasonable, sound discretion in applying them, which discretion will not be disturbed in the absence of a showing of its abuse." *Baltimore Transit Company v. Mezzanotti*, 227 Md. 8, 13–4, 174 A.2d 768 (1961); *Williams v. Moran*, 248 Md. 279, 236 A.2d 274 (1967).

■ There was no abuse of discretion in prohibiting further discovery without leave of court. In *Basiliko v. Royal National Bank*, 263 Md. 545, 284 A.2d 227 (1971), the court rejected appellant's claim that summary judgment should not have been granted, since appellant had not had sufficient time for discovery. The court held, "the point about discovery is completely without merit. The pleas were filed on October 19. The matter was argued ... on January 29. The intervening three and one-third months provided ample time for interrogatories and depositions." *Id.* at 548, 284 A.2d 227. In Maryland, the right to discovery proceedings is waivable. *Caton Ridge v. Bonnett*, 245 Md. 268, 276, 225 A.2d 853 (1967); *Maged v. Yellow Cab Co.*, 237 Md. 340, 206 A.2d 257 (1965). Nothing precluded

appellant from undertaking discovery at any time after the commencement of the action in September, 1980. The judge was fully within his power to permit discovery only with court approval, given the delays which had plagued the case. As in *Basiliko*, there was ample time for discovery prior to the January 11, 1984, order closing discovery.

For similar reasons, the judge did not abuse his discretion in refusing to reopen discovery generally. Had counsel requested leave of court in order to undertake particular discovery and set forth the specific reasons for the request, the posture of the case would be different. In its present posture, however, counsel requested the general reopening of discovery. Without more, there is no basis for finding the court's refusal to do so was an abuse of discretion.

## III.

### Miscellaneous

Appellant sets out numerous assignments of error which we will dispose of summarily. They are either waived or without merit. Most only reflect appellant's misunderstanding of the legal system. For example, appellant finds fault with the judge's failure to instruct the jury on the content of bench conferences and on allegedly inaccurate statements of counsel to which he did not object below. He also alleges the judge made "unprofessional remarks" from the bench in violation of appellant's constitutional rights. Besides being totally meritless, such allegations are waived by the failure to assert them below. M.R.P. 1085. Finally, appellant contends that alleged malfeasance of his attorneys deprived him of due process under the Fourteenth Amendment. Of course, without State action, the Fourteenth Amendment does not apply.

JUDGMENT AFFIRMED;

COSTS TO BE PAID BY APPELLANT.