257 Md. 370 (1970)
263 A.2d 548
IULA, ET AL.
v.
GRAMPA
[No. 279, September Term, 1969.]
Court of Appeals of Maryland.
Decided March 31, 1970.
Motion for rehearing filed April 13, 1970.
Denied May 4, 1970.
The cause was argued before HAMMOND, C.J., and BARNES, McWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.
Moses Davis for appellant Frank J. Iula.
Leon H.A. Pierson, with whom were Pierson & Pierson on the brief, for appellant Morgan L. Amaimo.
Alexander R. Martick, with whom was Robert V. Lazzaro on the brief, for appellee.
SINGLEY, J., delivered the opinion of the Court.
In the summer of 1961, Grampa, the plaintiff below and appellee here, was a 63 year old Italian immigrant who owned the Norge Bar on South Broadway in Baltimore. *372 Morgan L. Amaimo, a lawyer who practiced in Baltimore, came to Grampa's bar in connection with his representation of the son of one of Grampa's barmaids. In the course of conversations with Grampa, Amaimo learned that Grampa was considering retiring from the tavern business and might have some money to invest. Amaimo introduced Frank J. Iula, a friend and client, to Grampa.
In December of 1961 Grampa loaned $6,000 to Iula and Edward Davis, an associate of Iula's, and took back 12 of their joint confessed judgment notes for $625 each,[1] one of which matured each month commencing in February of 1962. The money borrowed by Iula and Davis was supposed to be used for the purchase of a tavern at Riviera Beach, a transaction which was never consummated. By March of 1962, two of the notes were in default. Grampa complained to Amaimo who arranged for Grampa to buy from Carmela A. Iula, Frank J. Iula's mother, a judgment for $15,000 which she had entered on 21 February 1962 on a confessed judgment note of Peacock Land Corporation (Peacock), of which Frank J. Iula was president. Grampa paid $11,250 for the judgment: $10,000 in cash and the two $625 notes of Iula and Davis which were then in default.
Both the notes and the judgment later proved to be worthless. Grampa had judgment entered on eight of the notes in November of 1962 and by February of 1964 all hope of collecting on the judgment assigned to Grampa by Mrs. Iula had vanished.
In March, 1965, Grampa filed a bill of complaint in Circuit Court No. 2 of Baltimore City against Amaimo, Iula, Mrs. Iula and Davis in which he sought a rescission of the transactions and an award of damages because of the fraud and deceit allegedly practiced upon him. Davis could never be found, and the case came on for hearing against Amaimo, Iula and Mrs. Iula. From a decree rescinding *373 the assignment of the judgment and entering judgment for $11,250 with interest from 13 March 1962 and costs against Amaimo and Iula, this appeal was taken. No cross appeal was entered in respect of the portion of the decree dismissing the bill as against Mrs. Iula or because the court refused to rescind the promissory notes.
Amaimo challenges the decree on the ground that it was error for the chancellor to find that Amaimo defrauded Grampa. Iula's argument is somewhat more complex: on the one hand he says that Grampa, having entered judgments on the eight notes, has elected his remedy and could not later seek equitable relief in connection with an obligation arising from the same transaction. On the other hand, Iula argues that there can be no fraud when the value of the assigned judgment eroded subsequent to the assignment as a result of events beyond his control.
In an effort to achieve simplicity, we propose to deal with these contentions in reverse order of presentation.

(i)

Election of Remedies
While Iula is quite correct in arguing that not more than one suit may be instituted on the same instrument, Maryland Code (1957, 1968 Repl. Vol.) Art. 50 § 2 and that rights cannot be enforced piecemeal, Ex parte Carlin, 212 Md. 526, 129 A.2d 827 (1957); Olmstead v. Bach, 78 Md. 132, 27 A. 501, 22 L.R.A. 74 (1893); Whitehurst v. Rogers, 38 Md. 503 (1873), these principles are not applicable here. The short answer to this contention is that there were two wholly different and quite distinct obligations: One was the joint obligation of Iula and Davis on the eight promissory notes which were ultimately reduced to judgment. The other was the judgment entered in favor of Carmela Iula against Peacock Land Corporation, which was assigned by Mrs. Iula to Grampa. Without passing on whether the rescission of the *374 notes was barred by limitations, as the court held, or because Grampa had elected his remedy, as Iula contends, we think that the chancellor was quite correct when he treated the transactions as separate and distinct and allowed recovery on the judgment and denied relief on the notes.

(ii)

Fraud
The question whether Amaimo and Iula or either of them practiced fraud and deceit on Grampa should be viewed in the light of two prior cases, Carozza v. Peacock Land Corp., 231 Md. 112, 188 A.2d 917 (1963) and Iula v. Progress Fed. S & L Ass'n, 247 Md. 421, 231 A.2d 510 (1967) both of which bear peripherally on the problem. In Carozza, we sustained the purchaser's exceptions to the ratification of a sale at foreclosure of Peacock's property in Baltimore County for $275,700, holding that the inaccurate description of the property in the advertisement of sale amounted to a material misrepresentation.
In Iula, we held that when the same property, correctly described in the advertisement, had been resold in March of 1963 for $224,000, there could be no recovery of damages under the facts of that case, by Iula, the mortgagor, against the mortgagee and the trustee who conducted the foreclosure sale because while neither the mortgagee nor the trustee was aware that the advertisement was in error, Iula did know and failed to disclose it.
What is salient here, however, goes beyond the rubric of the two cases. Peacock defaulted on its mortgage prior to 4 August 1961. On 25 September 1961, Peacock entered into a deed of trust for the benefit of creditors. On 10 November 1961, the property was sold for $275,700. The purchaser's exceptions were filed on 15 December 1961. Mrs. Iula entered her confessed judgment on 21 February 1962, more than two months after the exceptions had been filed. The exceptions were overruled on 18 May 1962, and on 19 March 1963, we filed our opinion, *375 holding that the exceptions should have been sustained and remanded the case in order that the property could be resold.
It was during the period between the institution of the foreclosure in August, 1961, and the hearing on the exceptions in May of 1962 that Grampa's conversations with Amaimo and Iula took place. Grampa described them in his testimony:
"Q * * * How often after you met Mr. Amaimo did you see him thereafter?
"A Pretty often. I would say, once every eight or ten days.
"Q I see. And would you describe to the Judge in your own words what you all said to each other and what you all conversed about?
"A Well, it was something like an acquaintance and we started talking and  Amaimo likes his beer, and he start talking. He start asking me different questions. How long had I been in business and so forth, and how old I was. I told him how old I was and I told him how long I was in business and that I had intentions to retire about a year after that. And he asked me what I intended to do after I retired. Well, I said, `After I sell my business, I have a piece of property and I intend to buy some more and take care of that.' And he told me he knew a lot about property. In fact, he says, `I have a shopping center and a gasoline station.' And he told me, `I know about a lot of property. If I run into something, would you consider it?' I said, `Well, it's too early yet. I intend to stay in business one more year and maybe more.' He said, `But it takes time to find something suitable.' He say, `Better start looking now.' I say, `Mr. Amaimo, I got plenty of time.' He say, `If I run into something, don't lose more time looking for anything.' So, that was it.

*376 "So, one day he stopped in my place and he asked me 
"Q You are talking about Mr. Amaimo?
"A Yes.
"Q Go ahead.
"A Mr. Amaimo, he asked me if I had time to take a little ride with him. I said, `Well, barmaid's here; business is slow.' I say, `All right, I take a ride with you.' He didn't told me where he going to take me or nothing. So, we take a ride out Belair Road and we stop by Mr. Iula's restaurant. I didn't know Mr. Iula until then.
"Q Excuse me. Is this the gentleman here?
"A That's Mr. Iula.
"Q You say you stopped in his restaurant?
"A Yes. He introduced me to Mr. Iula. He introduced Mr. Iula as his friend and his campaign manager."
Grampa said he went with Iula and Amaimo to the Peacock Restaurant which was closed. According to Grampa's testimony, Amaimo asked Grampa to lend Iula $60,000, which Grampa refused to do. He continued:
"Q What other deals did Mr. Amaimo come to you about?
"A A real estate deal. One time he took me out to West Baltimore one place. It was a block of row houses. He told me, if I wanted to buy them; it was a changing neighborhood; I could buy them very cheap. And I told him that I didn't like it and that was it.
"So, one time he come in with Mr. Iula and wanted me to buy a slaughterhouse in South Carolina.
"Q Buy a slaughterhouse?
"A Yes. I said, `I don't got the money to buy a slaughterhouse. I don't know nothing about the slaughterhouse.' He say, Mr. Amaimo say, `Mr. *377 Iula is going to run it for you and all you got to do is sit back and get your money.'"
Then, according to Grampa, Amaimo returned in late November, 1961:
"Q Who came?
"A Mr. Amaimo  always Mr. Amaimo. Mr. Iula never did come by himself. And he say, that Mr. Iula say, he had a place of business, the restaurant, but it was closed up and this manager, the restaurant manager, was without a job. He say, he wants to buy this business at Riviera Beach so this, Mr. Iula's manager, could run that business. So, Mr. Amaimo, we got in his car and he took me to Riviera Beach to look at this place.
"Q I see.
"A And he said  Mr. Amaimo now  after paying me $625.00 a month, plus $250.00 rent, Mr. Amaimo said, it was set for him, $250.00 rent 
"Q The rent was $250.00?
"A It was over $800.00 a month. I say, `I don't think this place can make it.' And he say, `Oh, I know this place.' Mr. Amaimo say, `I know this place from A to Z.' He say, `The slot machine take over $600.00 a week,' he told me. And he told me he knew the licensee and he knew the actual owner of that place, which was Francis Dippel."
Grampa told what happened next:
"Q And now, what happened after that, Mr. Grampa?
"A Well, Mr. Amaimo kept on hammering, and he told me that he was my lawyer and my friend. He told me to trust him; that he will never let me do anything that I would regret and he told me also to have a confidence in him *378 because he wasn't a bum. He said his name was Mr. Morgan Amaimo, attorney, candidate for governor, running for governor.
"Q What, if anything, did you do with regard to this $6,000.00?
"A Well, finally, on this great persistence and perseverance I give in and I gave him $6,000.00.
"Q Now, who did you give the money to?
"A I gave the money to Mr. Amaimo.
"Q Where did this take place?
"A In my place of business.
"Q On Broadway, at the Norge Cafe?
"A That's right.
"Q And who was there at the time the money changed hands?
"A Mr. Iula and Mr. Davis.
"Q I see. Was this money given in cash or by check?
"A In cash.
"Q In cash. And did you get anything for this $6,000.00 in cash at that time?
"A I get confessed judgment notes.
"Q Who gave you the confessed judgment notes?
"A It was signed by Mr. Iula and Mr. Davis, prepared by Mr. Amaimo.
"Q The notes were prepared by Mr. Amaimo?
"A Yes."
When the notes were not paid, Grampa said he got in touch with Amaimo. Then he described what happened:
"Q * * * Now, you had started to say that sometime later Mr. Amaimo and Mr. Iula came in about that Peacock deal. I ask you about when did they talk to you about the Peacock deal?
"A I can't remember exactly the date this is. After all, it's been eight years. It must have been *379 sometime in March, I think around about the 10th or 12th of March of 1962.
"MR. PIERSON [counsel for Amaimo]: 1962?
"A That's right.
"Q Now, who first mentioned the Peacock deal to you?
"A Huh?
"Q Who first mentioned the Peacock deal to you?
"A Mr. Amaimo.
"Q Mr. Amaimo?
"A Yes.
"Q All right. Now, what was said to you by Mr. Amaimo about the Peacock deal?
"A He told me that Mr. Iula need the money very badly and if I would give him $10,000.00 to take the assignment, which was $15,000.00.
"Q An assignment of what?
"A Huh?
"Q An assignment of what?
"A For the  I don't know. Something that belonged to Mrs. Iula. Something that Mrs. Iula had in the Peacock Corporation.
"Q I see. What, if anything, did Mr. Iula ever say to you about the Peacock deal?
"A Mr. Iula?
"Q Yes.
"A Well, Mr. Iula done hardly any talking. Mr. Amaimo done it all.
"Q I see.
"A Mr. Iula had hardly anything to say."
Then Grampa continued:
"Q * * * When you paid the $10,000.00 to Mr. Amaimo, whatever happened in connection with that deal?
"A Well, they give me that assignment, as I recall.
"Q They gave you the assignment in what?

*380 "A That's right. They took me down to Mr. Iula's house for Mrs. Iula to sign the assignment.
"Q Uh-huh. Where did that take place? Where did Mrs. Iula sign it?
"A At Timonium, York Road.
"Q Was that at her home?
"A Yes, that's her home, supposed to be.
"Q Who all went out there?
"A Mr. Amaimo and Mr. Iula and I.
"Q I see. And were you there when she signed the assignment?
"A I was there when she signed and she knew what was she signing, I don't doubt. While Mr. Amaimo asked Mrs. Iula if she knew and Mrs. Iula said to Mr. Amaimo, she said, `Knew what?' And he pointed to the assignment. In other words, if she knew what she signed, and Mrs. Iula said, `No.' Good thing that she don't.
"Q Let me ask you this. Who prepared or who made the assignment?
"A Who what?
"Q Who made, who prepared the assignment?
"A They had already prepared it when they came to me. Mr. Amaimo had already prepared when he came to me.
"Q All right. Now, after Mrs. Iula signed the paper, where did you all go?
"A To Mrs. Iula to sign the paper.
"Q No. I say, after she signed it.
"A After that we went to Towson Courthouse, Towson Court.
"Q Who went to the Towson Courthouse?
"A Mr. Iula and Mr. Amaimo. Mr. Amaimo wants to put the things on the record.
"Q I see. And what happened in the Towson Courthouse?

*381 "A Well, as far as I understand, they put those things on record.
"Q I see.
"MR. PIERSON: He what?
"Q He put those things on record, I understand.
"A The assignment.
"Q He put the assignment on record?
"A Yeah.
"Q And did you talk to anybody else while you were in the Courthouse?
"A Talk about what?
"Q Did you talk to anybody else while you were in the Courthouse?
"A I don't recall precisely. I think I talked to someone there, yes.
"Q Do you remember who it was and what was said?
"A That I don't remember who it was, no.
"Q Do you remember who introduced you to these people?
"A Mr. Amaimo did, he did.
"Q I see. Do you know who the people were?
"A No, I don't."
Amaimo and Iula tell a different version of the affair. They say that among the people Grampa saw in Towson were a court clerk, who helped to count Grampa's money, and assured him that the assignment was valid, and Nolan P. Chipman, a lawyer who was the trustee under Peacock's deed of trust for the benefit of creditors, and who said that the price of $275,700 obtained at the first foreclosure sale would satisfy the mortgage debts and leave $50,000 for creditors, including Grampa. Neither the clerk nor Chipman was produced as a witness. Another lawyer who was supposed to have given Grampa similar assurances, appeared voluntarily, and flatly denied any recollection of the incident.
The factual issue is whether on 12 March 1962, when Mrs. Iula sold to Grampa for $10,000 her $15,000 judgment *382 against Peacock, Amaimo and Iula knew, or should have known, that exceptions to the sale had been pending for three months; that there was a possibility that the sale might be set aside; and that the collectibility of Mrs. Iula's judgment hinged on the ratification of the sale for $275,700 or on a resale at some lesser amount sufficient to satisfy the first mortgage of about $120,000 held by Progress, a second mortgage of some $50,000 held by Empire Realty Company, arrearages of interest on both mortgages, another mortgage held by Regent Building Company, amounting to some $15,000, judgments of some $10,000, and the expenses which had been incurred incident to foreclosure.
In an oral opinion delivered from the bench at the conclusion of the testimony, the chancellor (Prendergast, J.) made findings of fact, which need only be summarized here:
1. That late in 1961 or early in 1962, Iula was "absolutely broke", and in desperate need of money.
2. That Amaimo knew of Iula's financial difficulties.
3. That Amaimo brought Iula to the Norge Bar and introduced him to Grampa.
4. That Grampa loaned Iula $6,000 on notes prepared by Amaimo.
5. That Amaimo received from one of Iula's corporations a fee of $700 for arranging this loan.
6. That when two of the notes were not paid at maturity Amaimo and Iula suggested that Grampa buy Mrs. Iula's $15,000 judgment for $11,250.
7. That at this time, the $15,000 judgment was "absolutely worthless" and this fact was known to Amaimo and Iula.
8. That Amaimo, who prepared the assignment of the judgment and received it from the clerk's office after it had been recorded, was at this point acting as counsel for Grampa, and continued to act for Grampa in May of 1962, when he received a fee of $150 for entering a general issue plea for Grampa in a damage suit and in November of 1962, when *383 he arranged for another attorney to enter confessed judgments on the Iula-Davis notes.
There was also evidence from which the chancellor could have found: (i) that Grampa had given Amaimo $50 and a case of whiskey for his representation of the son of the barmaid at the Norge Bar; (ii) that Amaimo and Iula were close personal friends, since Iula had been Amaimo's campaign manager in Amaimo's unsuccessful bid for the governorship, and Amaimo had represented Iula for 15 years or more; (iii) that Amaimo himself admitted that he was aware of Iula's financial difficulties, since he had raised some $225,000 in an abortive effort to avert the first Peacock foreclosure. It should also be noted that he represented Iula in Iula v. Progress Fed. S & L Ass'n, supra, 247 Md. 421.
We have reviewed the testimony in the light most favorable to the party prevailing below, Space Aero Products Co. v. R.E. Darling Co., 238 Md. 93, 106, 208 A.2d 74, 699 (1965), and conclude on the record before us that the chancellor's findings are not erroneous, much less clearly erroneous. Rule 886. Based on these findings, he correctly concluded that Amaimo and Iula had perpetrated a fraud on Grampa. Judge Marbury, speaking for the Court, stated the elements of fraud in Suburban Properties Management, Inc. v. Johnson, 236 Md. 455, 460, 204 A.2d 326 (1964) which were reiterated by the Court, speaking through Judge Barnes in James v. Goldberg, 256 Md. 520, 261 A.2d 753 (1970):
"* * * (1) that a representation made by a party was false; (2) that either its falsity was known to that party or the misrepresentation was made with such reckless indifference to truth to impute knowledge to him; (3) that the misrepresentation was made for the purpose of defrauding some other person; (4) that that person not only relied upon the misrepresentation but had the right to rely upon it with full belief of its truth, and that he would not have *384 done the thing from which damage resulted if it had not been made; and (5) that that person suffered damage directly resulting from the misrepresentation."
Compare McKeever v. Washington Heights Realty Corp., 183 Md. 216, 225, 37 A.2d 305 (1944) with Lambert v. Smith, 235 Md. 284, 288, 201 A.2d 491 (1964).
Transactions arising out of an attorney-client relationship are by no means insulated from scrutiny or challenge, and when challenged are prima facie void, thus imposing on the attorney the burden of proving understanding on the part of his client, fairness and the absence of undue influence and deception. Lopez v. Lopez, 250 Md. 491, 505, 243 A.2d 588 (1968); Keyworth v. Israelson, 240 Md. 289, 304, 214 A.2d 168 (1965); Hughes v. McDaniel, 202 Md. 626, 632-33, 98 A.2d 1 (1953); Baker v. Otto, 180 Md. 53, 22 A.2d 924 (1941). This Amaimo failed to do. While Iula did not share so heavy a burden, the argument that he was unaware of the uncertainties surrounding his mother's judgment is too transparent to be worthy of belief.
Decree affirmed, costs to be paid by appellants.
NOTES
[1] The $1,500 difference between the aggregate amount of the notes and the $6,000 loaned was "interest."