586 A.2d 760

**Charles C. WALTON, IV, Personal Representative of the Estate of Nancy Davy**

v.

**Walter DAVY, Personal Representative of the Estate of Myron Davy.**

**No. 719, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

March 1, 1991.

276

David L. Scull (Bethany J. Bridgham, on the brief), Chevy Chase, for appellant.

Francis E. Yeatman (Bradshaw, Thomas & Yeatman, on the brief), Silver Spring, for appellee.

Argued before BISHOP and GARRITY, JJ., and ROBERT I.H. HAMMERMAN, Judge, Specially Assigned.

BISHOP, Judge.

Appellant, Charles Walton, personal representative of the estate of Nancy Davy, filed an election on behalf of Nancy Davy to take the surviving spouse's intestate share of the estate of the decedent's husband, Myron Davy, pursuant to Md.Est. & Trusts § 3–203(a) Code Ann. (1990). In the alternative, if the court found that the election was barred by Md.Est. & Trusts § 3–204 Code Ann. (1974), appellant filed a claim against the estate of Myron Davy which alleged conflicts of interest by Walter Davy, its personal representative, and Hyman Rubin, Esq., its attorney of record. Following a bench trial, the election and the claim against the estate of Myron Davy were disallowed by the Circuit Court for Montgomery County sitting as the Orphans' Court for Montgomery County.[1]

---

1. Article IV, § 20(b) of the Constitution of Maryland provides:
 The judges of the Circuit Court for Montgomery and Harford Counties shall each, alternately and in rotation and on schedules to be established by those judges, sit as an Orphans' Court for their County, and shall have and exercise all the power, authority and jurisdiction which the present Orphans' Courts now have and exercise, or which may hereafter be provided by law.

## ISSUES

Appellant presents five issues on appeal which we have re-ordered and consolidated as follows:

I. Whether the attorney for the estate of Myron Davy is a party within the meaning of the Dead Man's Statute, Md.Cts. & Jud.Proc.Code Ann. § 9–116 (1989);

II. Whether Hyman Rubin's status as the attorney of record for the estate of Myron Davy, and his prior representation of Walter Davy in a divorce case, amounted to a conflict of interest with the interests of Nancy Davy such that Hyman Rubin's advice to Nancy Davy concerning her spousal rights would void her election not to file a request for her intestate share and thus permit the court to direct or permit a spousal election by the personal representative of her estate;

III. Whether Walter Davy improperly influenced Nancy Davy not to file a request for her intestate share and thus permit the court to direct or permit a spousal election by the personal representative of her estate; and

IV. Whether there was failure of notice to Nancy Davy of the probate proceedings and, if so, whether such failure of notice will permit the court to direct or permit a spousal election by the personal representative of her estate.

## FACTS

Myron and Nancy Davy (Myron and Nancy) died approximately three months apart in 1988. No children were born of their marriage, but each had children from a previous marriage. Myron had two sons, Charles and Walter Davy, and Nancy had one son, Charles Walton. Both Myron and Nancy had considerable personal estates.

At the time of his death on September 13, 1988, Myron left a gross estate valued at almost $2.4 million. Myron's principal assets were properties located in Washington, D.C. and Virginia, and stock in Boulevard Housing Corporation (BHC), a closely-held corporation of which he was the

president. BHC's principal business was the rental of residential and commercial real estate in Washington, D.C. At the time of Myron's death, the BHC stock was owned by Myron (263) shares, Nancy (180) shares, Walter (297) shares and Charles Davy (160) shares.

In 1978, Myron and Nancy executed separate wills prepared by attorney Clarence Keiser. Nancy's will bequeathed her tangible personal property to Myron and the remainder of her estate to her son, Charles Walton, if Myron survived her. If Myron did not survive her, Nancy's will bequeathed half of her estate to Charles Walton and one quarter each to Myron's children, Charles and Walter Davy. Charles Walton was nominated to be personal representative. Myron's will bequeathed approximately half his estate and all his tangible personal property to Nancy, one-fifth of the residuary to Nancy's son, Charles Walton and two-fifths of the residuary each to Myron's children, Walter and Charles Davy. Walter Davy was nominated to be personal representative. At the time of the execution of these wills the estimated value of Nancy's estate was $500,000.00 and the value of Myron's estate was estimated at $750,000.00.

In 1984, Nancy became ill and permanently bedridden. Nonetheless, she remained mentally alert until her death on December 20, 1988. There was testimony, however, that she became increasingly weak during the last few weeks of her life.

In 1985, Myron executed a new will which was again prepared by Keiser. He bequeathed his properties in Washington, D.C. and his stock in BHC to his son, Walter, his tangible personal property to Nancy, if she survived him, and equal shares of the residuary of his estate to his two sons, Charles and Walter Davy. Walter was again nominated to be personal representative. Keiser also prepared codicils to Walter and Nancy's wills that created identical trust funds for their servants. Keiser did not inform Nancy about Myron's new will.

In 1988, Myron executed a second codicil which was prepared by attorney Hyman Rubin. Rubin had done legal work for BHC from 1962 to 1984, and was a family friend on a first name basis with Myron, Nancy and Walter. Most of Rubin's work for BHC concerned landlord and tenant matters, real property issues and dealings with various departments of the District of Columbia government. Rubin also handled Walter's divorce during 1981–82. Myron's second codicil bequeathed to Walter three properties located in McLean, Virginia and all indebtedness due to Myron from BHC.

At Myron's death, Walter qualified as personal representative and Rubin became the attorney of record for the estate. Walter informed Nancy of the terms of Myron's 1985 will and 1988 codicil and advised her that she could elect to take one third of Myron's estate, pursuant to Md.Est. & Trusts Code Ann. § 3–203 (1990), instead of the tangible personal property bequeathed to her under the will. At about the same time, Walter retrieved Nancy's will from the house safe and learned that she had bequeathed one quarter of her estate to him and his brother, Charles. He suggested that she change her will to be more beneficial to her son, Charles Walton. She agreed and asked that Rubin prepare her new will. Her final will created a trust for her servants, bequeathed her BHC stock to Walter and bequeathed the residuary of her estate, both real and personal, to Charles Walton. Rubin reviewed each paragraph of the will with Nancy before she signed it.

During the time that Rubin was preparing Nancy's final will, he discussed with Nancy her spousal right of election against Myron's estate on two occasions. Rubin discussed with Nancy the approximate value of her and Myron's estates. He told Nancy that she had a right to take her intestate share of Myron's estate, which was larger than her testate share. Rubin also stated that he was very familiar with the procedure for filing an election against an estate, because he had done one previously and, if she desired, he would prepare an election for her. Rubin testi-

fied that he did not prepare such an election because Nancy did not want her intestate share, as she had more than enough assets to take care of her for the rest of her natural life. Rubin testified that at the time of these discussions with Nancy, she knew that he was the attorney of record for Myron's estate. Walter witnessed a significant portion of these conversations, but Rubin testified that even when Walter was present, the conversations were only between Rubin and Nancy. Nancy never filed an election to take her intestate share. At the time of her death, Nancy's estate was valued in excess of $3.2 million.

## Discussion

Md.Rule 8–131(c), which is derived from former Rules 1086 and 886, provides that where an action is tried without a jury, "[we] will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." If there is any evidence legally sufficient to support the court's findings, they are not clearly erroneous, for the weight of the evidence is a question for the court, sitting as the finder of fact. *Weisman v. Connors*, 76 Md.App. 488, 500, 547 A.2d 636 (1988), *cert. denied*, 314 Md. 497, 551 A.2d 868 1989); *Kline v. Chase Manhattan Bank*, 43 Md.App. 133, 141–2, 403 A.2d 395 *cert. denied*, 286 Md. 749 (1979); *Staley v. Staley*, 25 Md.App. 99, 110, 335 A.2d 114 *cert. denied*, 275 Md. 755 (1975).

In the case *sub judice*, the circuit court addressed appellant's claims of conflict of interest and undue influence under the general category of fraud. The standard for fraud relied on by the court in its order was as follows:

"A pleading setting up fraud or deceit as a basis for recovery must allege clearly and distinctly all of the essential elements of actionable fraud. Thus it must show that defendant made a representation with respect to a material fact; that such representation was made with knowledge of its falsity or with reckless disregard

for its truth or falsity; that it was made for the purpose of defrauding Plaintiff; that Plaintiff had a right to rely on it in the full belief of its [truth] and that it was acted upon by Plaintiff to his damage. See Maryland Law Encyclopedia, Volume 11, Fraud Section 22 and cases cited therein."

The court determined that appellant clearly did not establish fraud and made the following findings:

1. Following her husband's death and until her own death Nancy Davy was physically partially disabled but there was no evidence of any mental incompetence. She had nurses in the house but it was not necessary for them to be in her room all the time. Oxygen was taken through a tube, not a mask. She read mail, watched TV, signed checks, talked on the telephone, and carried on intelligent conversations with those around her. There was absolutely no credible testimony that Nancy Davy was in any way mentally incapacitated.

2. Setting aside the general rule that all are presumed to know and take notice of the law, Nancy Davy was informed specifically of her spousal rights of election on at least three occasions. First by her step-son, Walter Davy[,] and on two subsequent occasions by attorney Hyman Rubin. Mr. Rubin had had a long business and personal relationship with Mrs. Davy.

3. Nancy Davy had a substantial estate in her own right, valued in excess of $3.2 million at her death. If inferences are to be made about why Mrs. Davy did not elect to take her spousal share under the estate of her late husband, it is perfectly feasible to infer that she did so because of her own substantial estate and there was no need for her to make such an election.

4. Hyman Rubin, Esq.[,] who prepared Mrs. Davy's final will at her own request[,] acted at all times in a professional and responsible manner. The court finds that Mr. Rubin did in fact inform Mrs. Davy of her spousal rights, that he informed her properly insofar as

what he told her was accurate, and finally that the act of informing her at all was neither improper nor irregular.

5. Walter W. Davy neither urged Nancy B. Davy to write a new will in which he was named sole legatee of stock owned by her in Decedent's closely held business, Boulevard Housing Corporation, nor did he misinform her or fail to inform her concerning her spousal rights. Walter W. Davy impressed the Court as a man of high integrity and truthfulness. Clearly, Walter W. Davy was responsible for the vast majority of the work of developing and overseeing Boulevard Housing Corporation and there is absolutely nothing in the record from which one could make a finding that Nancy B. Davy in recognition of that long service to the corporation would not have rewarded Mr. Davy for his work as she in fact did in her last will.

We affirm the decision of the court, but for reasons other than those relied on by the court. *See Robeson v. State,* 285 Md. 498, 502, 403 A.2d 1221 (1979), *cert. denied,* 444 U.S. 1021, 100 S.Ct. 680, 62 L.Ed.2d 654 (1980); *Offutt v. Montgomery County Bd. of Educ.,* 285 Md. 557, 563, 404 A.2d 281 (1979) and *Burwell v. Easton Memorial Hosp.,* 83 Md.App. 684, 691, 577 A.2d 394 (1990). The findings of the court remain relevant to our decision and will not be disregarded unless they are clearly erroneous.

## I.

■ Appellant contends that Rubin's testimony, which related statements by Nancy, was barred by the Dead Man's Statute, Md.Cts. & Jud.Proc.Code Ann. § 9–116 (1989). We disagree. Section 9–116 provides:

A party to a proceeding by or against a personal representative, heir, devisee, distributee, or legatee as such, in which a judgment or decree may be rendered for or against them, or by or against an incompetent person, may not testify concerning any transaction with or statement made by the dead or incompetent person, personally or through an agent since dead, unless called to testify by

the opposite party, or unless the testimony of the dead or incompetent person has been given already in evidence in the same proceeding concerning the same transaction or statement.

The purpose of the statute is to equalize the parties' positions by imposing silence on the survivors as to transactions with or statements by the decedent and thereby require those who have asserted a claim against the decedent's estate to produce testimony from disinterested persons. *Reddy v. Mody,* 39 Md.App. 675, 679, 388 A.2d 555 *cert. denied,* 283 Md. 736 (1978). The statute is an exception to the general rule that all witnesses are competent to testify, *see* Md.Cts. & Jud.Proc.Code Ann. § 9–101 (1989), and is strictly construed "in order to disclose as much evidence as possible" without ignoring the purpose of the statute. *Reddy,* 39 Md.App. at 682, 388 A.2d 555. In defining the term "party",

> [t]he rule which has evolved is that a party is one who has an interest in the property sought or a person having a direct pecuniary and proprietary interest in the outcome of the case. Except in very unusual cases, the persons excluded from testifying are not those with an interest of any sort, but rather traditional real parties in interest and their representatives.

*Id. citing Trupp v. Wolff,* 24 Md.App. 588, 602, 335 A.2d 171 *cert. denied,* 275 Md. 757 (1975). In close cases involving the Dead Man's Statute, Maryland precedent consistently has favored the admission of testimony. *Trupp,* 24 Md.App. at 599–600, 335 A.2d 171 (and cases cited therein).

Rubin was not a party in this case, he was not a beneficiary under either Myron's or Nancy's will and he did not represent any of the beneficiaries. As the attorney of record for Myron's estate, Rubin's duty was to advise and aid Walter in the distribution of Myron's estate, but not to represent Walter personally. There was no evidence that the relationship extended beyond that of attorney of record and personal representative. Prior to trial, Rubin and his firm withdrew as attorneys for Myron's estate and thus

were completely uninvolved in the case. Even if Rubin and his firm had remained, they would not have been affected by the outcome of the case because it would not alter Myron's estate, only the amount distributed to each beneficiary. Rubin had no pecuniary or proprietary interest in the outcome of this case and was not a party within the meaning of the Dead Man's Statute.

## II.

■ Appellant contends that Rubin's advice to Nancy concerning her statutory right to an election of an intestate share amounted to a conflict of interest, which should allow the court to effect a spousal election by appellant, because Rubin advised Nancy while he was attorney of record for Myron's estate and after he had represented Walter in his divorce and BHC in property matters.

> The general rule is that an attorney at law, who has been retained and received the confidence of a client, is thereafter disqualified from acting for any other person adversely interested in the *same general matter*, however slight such adverse interest may be, but this adverse interest must be in its nature and sense hostile, antagonistic and conflicting with the interest of the former client. And an attorney may represent two clients who desire the same result, although their interests vary in degree.

*Rippon v. Mercantile–Safe Deposit and Trust Company,* 213 Md. 215, 223, 131 A.2d 695 (1956) (citations omitted) (emphasis in original); *cf.* Rule of Professional Conduct 1.7. *Conflict of Interest: General Rule.*

Appellant relies heavily on the strong language of *Derlin v. Derlin,* 142 Md. 352, 364, 121 A. 27 (1923) to emphasize this rule of law:

> Nor does it matter that the intention and motive of the attorney are honest. This rule is a rigid one, and designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the

honest practitioner from putting himself in a position where he may be required to choose between conflicting duties, or be led to an attempt to reconcile conflicting interests, rather than to enforce to their full extent the rights of the interest which he should alone represent.

(Citation omitted).

In *Derlin*, a widow/executrix, described as a nervous woman who was unaccustomed to dealing with a large estate, agreed to take a one-tenth share of her husband's estate in order to quell family differences, instead of the one-third share to which she was entitled. The lawyer who advised the widow about the distribution of the estate was the husband of one of the daughter beneficiaries. He advised the widow that she was entitled to one-third of the estate, but stated that he and the children would be "more pleased" if she agreed to accept only one-tenth of the estate, that this would be fair and right, and that this was probably her husband's intent. *Id.* at 361, 121 A. 27. The Court of Appeals found that the attorney's legal duties to the estate and the widow conflicted with his personal duty to his wife and affirmed the circuit court's avoidance of the agreement.

More recent cases, however, have weakened *Derlin.* In *Atlantic Richfield Co. v. Sybert*, 295 Md. 347, 456 A.2d 20 (1983), the Court of Appeals limited the circumstances under which a transaction will be set aside due to a conflict of interest.

Notwithstanding the apparent rigidity of this rule [in Derlin], this Court has determined that the consequences that flow from an attorney's simultaneous representation of adverse interests vary depending upon the facts and circumstances of each case. Thus, this Court has repeatedly held that ordinarily a transaction will be set aside if it is shown that a party to the transaction was represented by an attorney who simultaneously represented adverse interests, whether the adverse interests were those of the attorney or of other clients, *and* that the attorney exercised undue influence or perpetrated a fraud, or that the transaction was otherwise unfair. *E.g.,*

Iula v. Grampa, *257 Md. 370, 384, 263 A.2d 548, 555 (1970) (other client's adverse interest);* Hughes v. McDaniel, *202 Md. 626, 633–35, 98 A.2d 1, 4–5 (1953) (attorney's adverse personal interest);* Cook v. Hollyday, *185 Md. 656, 668–69, 671, 45 A.2d 761, 766, 768 (1946) (attorney's adverse personal interest);* Baker v. Otto, *180 Md. 53, 58, 22 A.2d 924, 927 (1941) (attorney's adverse personal interest);* Derlin, *142 Md. at 364, 121 A. at 31 (attorney's relatives adverse interest);* Merryman v. Euler, *59 Md. 588, 590–91 (1883) (attorney's adverse personal interest);* see Crest Inv. Trust, Inc. v. Comstock, *23 Md.App. 280, 302, 327 A.2d 891, 907 (1974) (other client's adverse interest). However, while reaching that result, this Court explicitly acknowledged that, if after full disclosure of the attorney's conflict of interest, a client had voluntarily and knowingly consented to enter into a transaction, such a transaction would not be set aside.*

295 Md. at 354, 456 A.2d 20 (emphasis added). *See also* Md. State Bar Association Committee on Ethics, Opinion No. 85-18, *Conflicts: Multiple Representation in Estate Matter* (1985) (no conflict in attorney's preparation of the wills of a father and son).

In the case *sub judice*, we find no conflict of interest. Rubin knew Myron, Nancy and Walter for more than twenty-five years. Rubin had both a personal and professional relationship with them. His legal work for BHC ended in 1984 and his representation of Walter during his divorce ended in 1982. No evidence was presented that suggested that these legal relationships would re-emerge. These matters are clearly unrelated to Nancy's election and present no conflict. *See, e.g., Blissard v. White,* 515 So.2d 1196, 1200 (Miss.1987) (attorney was competent to render independent legal advice to testatrix despite his previous preparation of a deed and two wills for the beneficiary).

Rubin's personal relationship with Nancy and Walter was ongoing and was the probable reason for his becoming attorney of record for Myron's estate and why Nancy selected him to prepare her final will. As we stated, *supra,*

Rubin did not represent Walter personally. There was no evidence that the relationship between Rubin and Walter extended beyond that of attorney of record and personal representative. Moreover, Rubin's duty to Myron's estate would not be changed by Nancy's decision because, as we also stated, *supra*, Nancy's election would not have changed Myron's estate, only its distribution. Finally, Rubin's testimony that Nancy knew that he was the attorney of record was uncontested. Therefore, we hold that Rubin's advice to Nancy was not in conflict with his status as attorney of record for Myron's estate. This is in accord with the court's holding that Rubin did not commit fraud and its finding that he acted professionally and responsibly at all times.

### III.

Appellant contends that Nancy did not file her election to take her intestate share of Myron's estate because Walter coerced her into nonaction. We disagree.

■ Where no confidential relationship is established by the evidence, the burden of demonstrating undue influence in a transfer of property by either an *inter vivos* transaction or by testamentary disposition is on the party asserting it. *Treffinger v. Sterling*, 269 Md. 356, 360-1, 305 A.2d 829 (1973) (*inter vivos* deed); *Wall v. Heller*, 61 Md.App. 314, 330, 486 A.2d 764 *cert. denied*, 303 Md. 297, 493 A.2d 350 (1985) (testamentary disposition). To meet this burden under either circumstance, that party must produce proof of coercion or a degree of influence sufficient to demonstrate that the free agency of the grantor or testator was destroyed. *Treffinger*, 269 Md. at 361, 305 A.2d 829; *Wall*, 61 Md.App. at 330, 486 A.2d 764. If, however, a confidential relationship is established, the determination of whether the transaction was an *inter vivos* transaction or a testamentary disposition is significant.

In the cases of gifts or other transactions *inter vivos*, it is considered by courts of equity, that the natural influ-

ence which such relations as those in question [priest-pa-rishioner and penitent], exerted by those who possess it, to obtain a benefit for themselves, is an *undue* influence. The law regarding wills is very different from this. The natural influence of the parent or guardian over the child, or the husband over the wife, or the attorney over the client, may lawfully be exerted to obtain a will or legacy, so long as the testator thoroughly understands what he is doing, and is a free agent.

*Sellers. v. Qualls*, 206 Md. 58, 72, 110 A.2d 73 (1954) (citations omitted) (emphasis in original). Because Nancy's decision to accept her testate rather than her intestate share of Myron's estate was made during her lifetime and the resulting distribution could have been done during her lifetime, it was an *inter vivos* decision similar to a transfer of property by deed. Therefore, if a confidential relationship is established by the claiming party, the burden of establishing the fairness of the transaction will be cast upon its beneficiary and it will be judged by a higher standard than if it were a testamentary disposition. *Id.; Treffinger*, 269 Md. at 361, 305 A.2d 829.

 A confidential relationship must be proven and will not be presumed merely because the transaction occurred between an elderly parent and his or her child. Such a finding depends on the parent's advanced age, physical debility, mental feebleness and dependence on the child. None of these factors is conclusive, but is given that weight which is warranted under the circumstances. *Treffinger*, 269 Md. at 361, 305 A.2d 829. *See also, Wall*, 61 Md.App. at 331, 486 A.2d 764 ("The Court has held ... that neither [an illicit] relationship nor an unnatural disposition of property is sufficient *per se* to warrant a conclusion of undue influence." (citation omitted)).

 In the case *sub judice,* the court found that Nancy was in her seventies, partially physically disabled, and mentally competent. She was confined to her bed and had nurses in the house, but was not under constant care. She

read mail, watched television, signed checks (based on Walter's advice), talked on the telephone and carried on intelligent conversations with those around her. These findings by the court are clearly supported by the facts.

We further find that Nancy possessed an estate worth in excess of $3.2 million and that she had some business experience having served as the Treasurer of BHC. While she relied on Walter's advice and assistance to manage her finances, she understood them. Appellant, who moved into Nancy's house after Myron's death, testified that he could have assisted Nancy with her finances but allowed Walter to help her exclusively.

Walter's relationship to Nancy is substantially similar to the confidential relationship found between a mother and her son in *Gaver v. Gaver*, 176 Md. 171, 4 A.2d 132 (1939). In *Gaver*, the mother deeded land to her son, Oscar, one of her several children. Because Oscar was his mother's contact with the outside world, the court found that a confidential relationship existed between them.

> The conclusion that Oscar stood in a confidential relationship to his mother seems unavoidable. Assuming that her mind was clear, physically she was helpless. Oscar was her only contact with the world beyond her room. She relied upon him for the management of her affairs. She signed checks, but he drew them, she made no investments except upon the advice of her sons, in later years usually that of Oscar, he deposited her money in bank, and while she signed checks she signed them in reliance upon the information and advice of others.... [Oscar] managed the farm and sold the crops. Alfred [another son] testified that Oscar kept her bank books, and Oscar did not contradict him.

176 Md. at 185–6, 4 A.2d 132. Likewise, we find that a confidential relationship existed between Walter and Nancy. Based on the fact finding of the trial court, we now determine whether Nancy's decision to accept her lesser testate share was fair, in other words, whether Walter improperly influenced her to accept less, so as to benefit himself.

Myron intended to benefit his sons, Walter and Charles Davy, under his will. Nancy, whose estate was valued in excess of $3.2 million, fulfilled Myron's intention by accepting her minimal testate share. The court found that Nancy was financially secure without her intestate share and we agree.

Nancy was advised by both Walter and Rubin that she could request her greater intestate share. The court found Walter and Rubin to be truthful men who properly informed Nancy of her rights. The court then found that, based on this information and advice, Nancy chose to accept her testate share because she did not need her greater intestate share. We find no facts to indicate that the court's findings were clearly erroneous.

The facts indicate that Nancy was free to disagree with the desires of those around her. For example, appellant testified that an elevator was installed for Nancy to enable her to leave her room, but despite everyone's advice that she use it, she refused. These findings and facts establish that Walter's advice was truthful, that Nancy was not only able to make her own decision about Myron's estate but, that she did make her own decision. We find no undue influence by Walter. The court's finding, that Walter did not commit fraud, is supported by the record.

Having determined that there was no conflict of interest by Rubin or undue influence by Walter, Nancy's right to file an election cannot be exercised by her personal representative after her death. *See*, Md. Estates and Trust Code Ann. § 3–204 (1974); *Bunch v. Dick*, 287 Md. 358, 412 A.2d 405 (1980).

## IV.

Appellant contends that the Register of Wills must notify Nancy by restricted delivery mail with delivery restricted to addressee. Because the letter was allegedly received by one of her servants, appellant argues that Nancy did not receive actual notice from the Register of

Wills of her right to an intestate share of Myron's estate and thus her personal representative should be allowed to make her election. Appellant, however, provides no law or evidence to support his claim. Appellant relies solely on Md.Est. & Trusts Code Ann. § 1–103(a) (1990) which states that "first notice ... is sufficient if deposited as restricted delivery mail, postage prepaid, return receipt requested, addressed to the addressee at the address last known to the sender, with delivery restricted to the addressee." Section 1–103(a) makes no mention of the Register of Wills.

Appellant's citation to the record to support his allegation that the notice was accepted by a servant, was to his attorney's statement to the court to this effect. Remarks by counsel are not evidence. *See, e.g., Goff v. Richards,* 19 Md.App. 250, 252, 310 A.2d 203 (1973), *appeal after remand,* 26 Md.App. 344, 338 A.2d 80 (1975) (statements by attorney in opening statement are not evidence). Although there is a postal receipt in the Record Extract, its exhibit number does not correspond to the exhibit admitted into evidence. The Record Extract is 438 pages long, and we have not been referred to the location of the postal receipt in the record extract, if the correct one, indeed, was ever admitted. Under these circumstances, we conclude that the issue has been waived. Md. Rule 8–504(c); *Larmore v. Larmore,* 241 Md. 586, 589, 217 A.2d 338 (1966). "Surely it is not incumbent upon this Court, merely because a point is mentioned as being objectionable at some point in a party's brief, to scan the entire record and ascertain if there be any ground, or grounds, to sustain the objectionable feature suggested." *State Roads Commission v. Halle,* 228 Md. 24, 32, 178 A.2d 319 (1962).

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.